RICE ᴇᴛ ᴀʟ. *v.* SANTA FE ELEVATOR CORP. ᴇᴛ ᴀʟ.

NO. 470.

Argued February 13, 14, 1947.—Decided May 5, 1947.

*Lee A. Freeman* argued the cause and filed a brief for petitioners in No. 470.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for petitioners in No. 472. With him on the brief was *George F. Barrett,* Attorney General.

*Leo F. Tierney* argued the cause for respondents. With him on the brief were *Ferre C. Watkins, Charles F. Meyers, Floyd E. Thompson, Frederick Mayer, Carl Meyer* and *Louis A. Kohn.*

*Acting Solicitor General Washington, Assistant Attorney General Berge, Robert C. Barnard, W. Carroll Hunter* and *Lewis A. Sigler* filed a brief for the United States, as *amicus curiae,* urging affirmance.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

Respondents in these two cases are warehousemen engaged in the business of operating public warehouses for the storage of grain in Illinois. Their warehouses are operated under licenses issued by the Secretary of Agriculture pursuant to the United States Warehouse Act, 39 Stat. 486, as amended, 7 U. S. C. § 241 *et seq.* The Rice partnership, one of the petitioners, is an owner, shipper, and dealer in grain and is a customer of respondents. The Illinois Commerce Commission, another petitioner, has certain regulatory jurisdiction, to which we will later refer, over public grain warehouses and other public utility companies.

In 1944 Rice filed a complaint with the Commission, charging respondents [1] with maintaining unjust, unreason-

---

[1] The Chicago Board of Trade was also joined as a defendant in the proceedings before the Illinois Commerce Commission. The issues

able, and excessive rates and charges contrary to the Illinois Public Utilities Act, Ill. Rev. Stats. 1945, ch. 111 2/3. It charged them with discrimination in storage rates in favor of the Federal Government and its agencies and against other customers, contrary to the Public Utilities Act and the Illinois Grain Warehouse Act, Ill. Rev. Stats. 1945, ch. 114, § 189 *et seq.* It alleged that respondents were both warehousemen and dealers in grain and by reason of those dual and conflicting positions had received undue preferences and advantages to the detriment of and in discrimination against petitioners and other customers of respondents,[2] all in violation of provisions of the Public Utilities Act, the Grain Warehouse Act, or the Illinois Constitution of 1870, Article XIII. It charged respondents with having failed to provide reasonable, safe, and adequate public grain warehouse service and facilities, with issuing securities, with abandoning service, and with entering into various contracts with

raised concerning it are considered in the companion cases decided this day, *Rice* v. *Board of Trade,* and *Illinois Commerce Commission* v. *Board of Trade, post,* p. 247.

[2] The preferences were alleged to have arisen from the practice of respondents in "(a) Mixing high quality public grain with inferior grain owned or acquired by the defendant warehouseman to reduce grain delivered to the point of minimum quality within the established grain trade [sic]. (b) Sacrificing part of storage charges to offset purchases and sales of grain and otherwise manipulating and rebating storage charges on grain stored in private warehouse space. (c) Furnishing transit tonnage to owners of public grain of the most undesirable type, while withholding for their own use the most desirable transit tonnage, thereby placing the owners of public grain at a distinct disadvantage in merchandising grain in storage. (d) Providing for storage of public grain in old wooden warehouses carrying exorbitant insurance premium rates, while storing the warehousemen's own grain in modern warehouses with reasonable insurance premium rates. (e) Unduly and imprudently delaying loading of grain after return of warehouse receipt issued by the particular warehouseman, the tender of proper charges and the receipt of instructions to load grain for delivery."

their affiliates without prior approval of the Commission; with rendering storage and warehousing services without having filed and published their rates; with operating without a state license; and with mixing public grain with grains of different grades—all in violation of provisions of the Public Utilities Act or the Grain Warehouse Act. Among the remedies sought were the fixing of just, reasonable, and non-discriminatory rates, the prohibition of unlawful discriminatory practices, the establishment of reasonable, safe and adequate storage and warehousing service, and the assessment of penalties for violations of Illinois law, including the cancellation of grain warehouse licenses.

Respondents moved to dismiss on the ground that the United States Warehouse Act superseded the authority of the Commission to regulate in the manner sought by the complaint. The Commission denied the motion and set the cause for a hearing on the merits. Thereupon respondents brought these suits in the District Court to enjoin further proceedings before the Commission and to enjoin the Attorney General of Illinois from instituting any proceedings against respondents to enforce any order of the Commission in the matter. Motions of petitioners to dismiss were granted. On appeal the Circuit Court of Appeals reversed, holding that the United States Warehouse Act superseded state regulation of respondents as to the matters presented in petitioners' complaint.[3] 156 F. 2d 33. The cases are here on petitions for writs of certiorari which we granted because of the public importance of the questions presented.

The United States Warehouse Act, as originally enacted in 1916 (39 Stat. 486), made federal regulation in this field subservient to state regulation. It provided in § 29 that "nothing in this Act shall be construed to conflict

---

[3] Accord: *In re Farmers Co-op. Assn.*, 69 S. D. 191, 8 N. W. 2d 557.

with, or to authorize any conflict with, or in any way to impair or limit the effect or operation of the laws of any State relating to warehouses, warehousemen . . . ." And § 6 required an applicant for a federal warehouse license to provide a bond "to secure the faithful performance of his obligations as a warehouseman" under state as well as under federal law.

In 1931 Congress amended the Act. 46 Stat. 1463. Section 29 was amended[4] to provide that although the

---

[4] The Secretary of Agriculture who recommended the 1931 amendment to § 29 gave the following reasons:

"The amendment suggested relative to section 29 aims to make the Federal warehouse act independent of any State legislation on the subject. As the law now reads, it can be nullified by State legislation. There are conflicts at present between the State laws and the Federal act. For instance, under certain State laws warehousemen are permitted to ship the products from their warehouses to a terminal or other warehouse while the receipts are outstanding. The prime purpose of the Federal warehouse act is to make it possible to finance, properly, agricultural products while in storage. No banker can safely loan on a warehouse receipt representing a product to be in a certain warehouse when, as a matter of fact, it may be moved under authority of State law to some other and distant warehouse. The Federal warehouse act, as now worded, specifically prohibits removal of the product prior to the return of the receipts. This department emphatically believes that this requirement of the Federal act is sound and the banking fraternity generally shares that same feeling. It is at once apparent to you, of course, that if the Federal act may be nullified by State laws with respect to a feature as important as this that the value of Federal warehouse receipts might be destroyed. For that reason, then, we have suggested amending section 29 so as to make the Federal warehouse act independent of any State legislation on warehousing."

Hearing before Senate Committee on Agriculture and Forestry on H. R. 7, 71st Cong., 3d Sess., p. 10. And see *id.*, pp. 22–26.

*Independent Gin & W. Co.* v. *Dunwoody*, 40 F. 2d 1, arose under the law as originally enacted. It was a suit brought by warehousemen, who were licensed under the Federal Act, to enjoin officials of Alabama from enforcing provisions of Alabama warehouse law. These were

Secretary of Agriculture "is authorized to cooperate with State officials charged with the enforcement of State laws relating to warehouses, warehousemen," and their personnel, "the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this Act shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect." Section 6 was amended to omit the requirement that the bond be conditioned on compliance with requirements of state law.

*First.* The chief matters which are the basis of the complaint before the Commission are treated as follows by the Illinois law and by the Federal Act:

(1) Just and reasonable rates. The complaint charges that respondents' rates are unjust and unreasonable. Under the Illinois statute public utility rates must be just and reasonable; and the Commission after a hearing may fix rates which meet that standard. §§ 32, 36, 41, Public Utilities Act. The Secretary of Agriculture is authorized by the Federal Act to license warehousemen [5] on condition that they conform to the requirements of the Act and the rules and regulations prescribed thereunder.[6] §§ 4, 9. Every receipt of a licensed warehouse must disclose "the rate of storage charges." § 18 (e). Before a license is granted the applicant must file his proposed rates with the Secretary. Reg. 5, § 3. He must also file

provisions requiring payment of a graduated license or privilege tax, for the giving of a bond, for the obtaining of a license and for submission to state regulation concerning the suitability and adequacy of the warehouse structure, the character of records to be kept, the inspection of the warehouse buildings and the audit of the books. Agr. Code Ala. 1927, §§ 388–407. The Federal Act was construed not to exclude such state regulation.

[5] Section 2 of the Act includes in the definition of "warehouse" every building "in which any agricultural product is or may be stored for interstate or foreign commerce . . . ."

[6] The regulations are contained in 7 C. F. R., Part 102.

any proposed changes in rates before making them effective. *Id.* Rates which are "unreasonable or exorbitant" are prohibited. *Id.* And the Secretary may, after hearing, suspend or revoke the license if "unreasonable or exorbitant charges have been made for services rendered." § 25; Reg. 2, § 7.

(2) Discrimination. The complaint alleges that respondents discriminate against the public and in favor of the Federal Government and its agencies by granting the latter preferential storage rates. The power of the Illinois Commission to fix rates, to which we have referred, includes the power to eliminate discriminatory rates. And see Grain Warehouse Act § 15. The Federal Act requires the publication and disclosure of licensed warehousemen's rates, as we have seen. Section 13 of the Federal Act makes it the duty of a licensed warehouseman to receive agricultural products for storage "in the usual manner in the ordinary and usual course of business, without making any discrimination between persons desiring to avail themselves of warehouse facilities." And by § 25 the Secretary is granted authority to suspend or revoke any license of a warehouseman "for any violation of or failure to comply with any provision of this Act . . . ."

(3) Dual position of warehousemen. The complaint charged violations of Illinois law by acts of respondents in storing and dealing in their own grain while storing grain for the public. See *Hannah* v. *People,* 198 Ill. 77, 64 N. E. 776. The Federal Act requires every receipt issued for agricultural products by a licensed warehouseman to disclose "if the receipt be issued for agricultural products of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership . . . ." § 18 (i). In addition, the receipts for grain must contain "in event the relationship existing between the warehouseman and any depositor is not that of strictly disinterested custodianship, a statement setting forth the

actual relationship . . . ." Reg. 4, § 1 (a) (3). Moreover, § 5a (7) of the Commodity Exchange Act, 49 Stat. 1491, 1498, 7 U. S. C. § 7a (7) provides that receipts issued under the United States Warehouse Act "shall be accepted in satisfaction of any futures contract . . . without discrimination and notwithstanding that the warehouseman issuing such receipts is not also licensed as a warehouseman under the laws of any State or enjoys other or different privileges than under State law . . . ."

(4) Mixing high quality public grain with inferior grain owned by respondents, delay in loading grain. The complaint charges that these practices [7] are part of the abuses flowing from the conflicting positions of respondents as public grain warehousemen and dealers in grain. They are alleged to violate the rule of *Hannah* v. *People, supra,* and provisions of the Public Utilities Act which prohibit any preference or advantage to any person and which disallow any act of prejudice or disadvantage to any person. § 38. And see Grain Warehouse Act § 17. Section 13 of the Federal Act, as we have seen, provides that every licensed warehouseman "shall receive for storage" any agricultural product "without making any discrimination between persons desiring to avail themselves of warehouse facilities." Section 15 provides for the inspection and grading of fungible agricultural products by federal inspectors. Section 16 permits licensed warehousemen "if authorized by agreement or by custom" to mingle fungible products with other products "of the same kind and grade." Section 16 likewise prohibits the mixing of fungible products "of different grades." [8] Section 30 provides fine and imprisonment for any person who fraud-

---

[7] See note 2, *supra.*

[8] The regulations promulgated under the Federal Act implement these provisions. Reg. 5, § 12 provides that licensed warehousemen shall accept grain for storage and deliver grain out of storage in ac-

ulently classifies, grades, or weighs any agricultural product stored under the provisions of the Act. Section 21 provides that a warehouseman in absence of some lawful excuse shall deliver "without unnecessary delay" the stored products on proper demand.

(5) Sacrificing or rebating storage charges, retaining desirable transit tonnage, utilizing preferred storage space. These practices, charged in the complaint,[9] are alleged to be other manifestations of the evils of a public warehouseman also being a dealer in grain. They are said to be violative of the principles announced in *Central Elevator Co.* v. *People,* 174 Ill. 203, 208–209, 51 N. E. 254, 256. And these practices are said to be acts of prejudice or disadvantage outlawed by § 38 of the Public Utilities Act which we have already mentioned. On the other hand, the Federal Act, as we have seen, requires every licensed warehouseman to "receive for storage" any agricultural product "without making any discrimination between persons desiring to avail themselves of warehouse facilities." § 13.

(6) Maintenance of unsafe and inadequate elevators; inadequate and inefficient warehouse service. The complaint alleges that as a result of these practices fire insurance premiums have become exorbitant and prohibitive; that owners of grain have suffered damages due to the deterioration of grain. The Illinois Commission is granted broad powers over the maintenance of facilities which are adequate and efficient (§§ 32, 49, Public Utilities Act) including the power to order the making of additions, exten-

---

cordance with the grades of such grain determined by a federal inspector. Reg. 5, § 16 provides that such warehousemen shall deliver to the lawful holder of a receipt grain of the grade and quantity named in the receipt. Reg. 5, § 18 provides that grain of different grades may not be mixed except, *inter alia,* when the identity of the grain to be stored is to be preserved.

[9] See note 2, *supra.*

sions, repairs, improvements, or changes. *Id.*, § 50. By § 3 of the Federal Act the Secretary of Agriculture is authorized "to determine whether warehouses for which licenses are applied for or have been issued under this Act are suitable for the proper storage of any agricultural product . . . ." Section 3 also grants the Secretary authority to prescribe the duties of warehousemen "with respect to their care of and responsibility for agricultural products stored" in licensed warehouses.[10] No license will be granted if the warehouse is found "not suitable for the proper storage of grain." Reg. 2, § 5. Every warehouseman must exercise "such care in regard to grain in his custody as a reasonably careful owner would exercise under the same circumstances and conditions." Reg. 5, § 8. Every warehouseman must keep "his warehouse reasonably clean at all times and free from straw, rubbish, or accumulations of materials that will increase the fire hazard or interfere with the handling of grain." Reg. 5, § 15.

(7) *Operating without a state license.* The complaint charges that respondents may not lawfully operate without a license from Illinois. See Grain Warehouse Act § 3. The Federal Act gives the Secretary of Agriculture authority to issue licenses on terms and conditions specified. §§ 3, 4, 5.

(8) *Abandonment of warehousing service.* The complaint alleges that respondents have abandoned services without consent of the Illinois commission. Approval of the Commission to abandon or discontinue service is required. § 49a, Public Utilities Act. Licenses issued under the Federal Act "shall terminate as therein [§§ 4, 9]

---

[10] And see § 23 requiring reports to the Secretary "concerning such warehouse and the condition, contents, operation, and business thereof" and providing that the licensee "shall conduct said warehouse in all other respects in compliance with this Act and the rules and regulations made hereunder."

provided, or in accordance with the terms of this Act and the regulations thereunder . . . ." § 5. By § 25 the Secretary is authorized to suspend or revoke a license for any violation of the Act or the regulations. Among the grounds for revocation specified in the regulations is ceasing to conduct the licensed warehouse. Reg. 2, § 7.

(9) Failure to file and publish rate schedules; rendering warehousing service without filing and publishing schedules. These matters, charged in the complaint, are regulated by §§ 33 and 35 of the Public Utilities Act. Under the Federal Act a warehouseman must file his rate schedules before a license issues; proposed changes in them must be filed before made; the current schedule of charges must be posted in a conspicuous place in the principal office where receipts issued by the warehouseman are delivered to the public. Reg. 5, § 3; Reg. 2, § 6.

As we have seen, Congress in 1931 made the "power, jurisdiction, and authority" of the Secretary of Agriculture conferred by the Act "exclusive with respect to all persons securing a license" under the Act, so long as the license remains in effect. It is argued by respondents that § 29 should be construed to mean that the subjects which the Secretary's authority touches may not be regulated in any way by any state agency, though the scope of federal regulation is not as broad as the regulatory scheme of the State and even though there is or may be no necessary conflict between what the state agency and the federal agency do. On the other hand, petitioners argue that since the area taken over by the Federal Government is limited, the rest may be occupied by the States; that state regulation should not give way unless there is a precise coincidence of regulation or an irreconcilable conflict between the two.

It is clear that since warehouses engaged in the storage of grain for interstate or foreign commerce are in the federal domain, *United States* v. *Hastings,* 296 U. S. 188,

230

Congress may, if it chooses, take unto itself all regulatory authority over them (see *New York Central R. Co.* v. *New York & Pa. Co.,* 271 U. S. 124), share the task with the States, or adopt as federal policy the state scheme of regulation. See *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 430–436. The question in each case is what the purpose of Congress was.

Congress legislated here in a field which the States have traditionally occupied. See *Munn* v. *Illinois,* 94 U. S. 113; *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 148–149. So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605, 611; *Allen-Bradley Local* v. *Wisconsin Employment Board,* 315 U. S. 740, 749. Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566, 569; *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines* v. *Davidowitz,* 312 U. S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co.* v. *Railroad Commission,* 236 U. S. 439; *Charleston & W. C. R. Co.* v. *Varnville Co.,* 237 U. S. 597; *New York Central R. Co.* v. *Winfield,* 244 U. S. 147; *Napier* v. *Atlantic Coast Line R. Co., supra.* Or the state policy may produce a result inconsistent with the objective of the federal statute. *Hill* v. *Florida,* 325 U. S. 538. It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory

measures has left the police power of the States undisturbed except as the state and federal regulations collide. *Townsend* v. *Yeomans,* 301 U. S. 441; *Kelly* v. *Washington,* 302 U. S. 1; *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202.

A forceful argument is made here for the view that the Illinois regulatory scheme should be allowed to supplement the Federal Act and that the Illinois Commission should not be prevented from acting on any of the matters covered by Rice's complaint, unless what the Commission does runs counter in fact to the federal policy. That is to say, the actual operation of the state system may be harmonious with the "measure of control" over warehousemen which the Federal Act imposes. *Federal Compress Co.* v. *McLean,* 291 U. S. 17, 23. That, it is said, can only be determined after the Illinois Commission has acted.

That argument is illustrated in several ways. The Illinois Commission may fix rates; the Secretary of Agriculture cannot. He may, to be sure, suspend or revoke licenses if unreasonable or exorbitant charges are made. If the Commission fixes unreasonable or exorbitant rates, there will be a conflict with the Federal Act and the state rate order must fall. But until it is known what the Commission will do, no conflict with the Federal Act can be shown. If indeed it reduces rates, as may be presumed, no conflict with the Federal Act will likely exist. Another illustration concerns the dual position of the warehousemen. It is pointed out that all the Federal Act requires is disclosure; that the more basic state policy of uprooting the practice of public warehousemen storing and dealing in their own grain is not inconsistent with the federal policy of disclosure. Another illustration relates to the preferential and discriminatory practices in connection with the rebate of storage charges, retention of desirable

transit tonnage, and the utilization of preferred storage space. All the Federal Act requires is that warehousemen receive products for storage without making discriminations between persons. What the Illinois Commission promulgates or requires, if the proceedings before it are allowed to go ahead, might indeed strengthen and bolster the federal regulatory scheme and in no way dilute, impair or oppose it. Such reasoning could be applied to each of the nine charges which we have summarized, even including, perhaps, the requirements for a state license and the filing and publishing of rate schedules. See *Union Brokerage Co. v. Jensen, supra.*

At first blush that construction of the Federal Act has great plausibility. It preserves intact the federal system of warehouse regulation, leaves the State free to protect local interests, and strikes down state power only in case what the State does in fact dilutes or diminishes the federal program.

But the special and peculiar history of the Warehouse Act indicates to us that such a construction would thwart the federal policy which Congress adopted when it amended the Act in 1931. Prior to that time, as we have pointed out, the Federal Act by reason of its express terms had been subservient to state laws relating to warehouses and warehousemen. Congress in 1931 found that condition unfavorable and undertook to change it. If Congress had done no more than to eliminate from § 29 the language which resulted in the Act's subservience, there would be a strong case for holding that state regulatory systems were not to be affected unless they collided with the Act. That construction would receive reinforcement from the provision in § 29 that the Secretary "is authorized to cooperate with State officials charged with the enforcement of State laws" relating to warehouses and warehousemen. Cf. *Union Brokerage Co. v. Jensen,*

*supra,* p. 209. But Congress did not choose that simple expedient. It went further and added to § 29 the mandatory words "the power, jurisdiction, and authority" of the Secretary conferred under the Act "shall be exclusive with respect to all persons" licensed under the Act. And the original provisions of § 6 requiring a bond from licensees securing the faithful performance of their obligations as warehousemen under state law were deleted.

These actions were explained in the Committee Reports.

The previous subservience of the Act to state law was said to have militated "against the full value of Federal warehouse receipts for collateral purposes." [11]  S. Rep. No. 1775, 71st Cong., 3d Sess., p. 2. The amendment to § 6 followed "naturally" the revision of § 29. *Id.* The amendment to § 29 was designed to make "the Federal act independent of State laws" and to "place the Federal act on its own bottom." *Id.* While a warehouseman need not operate under the Act, if he chose to be licensed under it, he would then "be authorized to operate without regard to State acts and be solely responsible to the Federal act." *Id.* Warehousemen, having made their choice

---

[11] The Senate Report also stated, p. 2:

"Bankers have repeatedly pointed out that this section of the warehouse act is its weakest feature. This amendment will clarify and remove many uncertainties from the credit man's viewpoint. As the law now reads, for fear the Federal act may be negatived by State legislation or regulation, a banker is obliged to follow closely the laws of the 48 different States, the regulations thereunder, and the administrative rulings thereunder. This is an impossible task. The suggested amendment will place the Federal act independent of State acts and should enhance the value of receipts for collateral purposes."

And see H. R. Rep. No. 4, 71st Cong., 1st Sess. As stated in note 4, *supra,* the amendment was recommended by the Secretary of Agriculture "so as to make the Federal warehouse act independent of any State legislation on warehousing."

234

to operate under state or federal law, should "then be permitted to operate without interference on the part of any agency." *Id.*, pp. 2–3. Or, as stated by the House Committee, the purpose of the amendment to § 29 was to make the Act "independent of any State legislation on the subject." H. R. Rep. No. 2314, 70th Cong., 2d Sess., p. 4.

That is strong language. It makes unambiguous what was meant by the deletion from § 6 of any requirement that federal licensees comply with state laws regulating warehousemen. It makes clear the significance to be attached to the special wording of § 29. The amendments to § 6 and § 29, read in light of the Committee Reports, say to us in plain terms that a licensee under the Federal Act can do business "without regard to State acts"; that the matters regulated by the Federal Act cannot be regulated by the States; that on those matters a federal licensee (so far as his interstate or foreign commerce activities are concerned) is subject to regulation by one agency and by one agency alone.[12] That is to say, Congress did more than make the Federal Act paramount over state law in the event of conflict. It remedied the difficulties which had been encountered in the Act's administration by terminating the dual system of regulation. Cf. *First Iowa Hydro-Electric Coop.* v. *Federal Power Commission*, 328 U. S. 152. As stated by the Supreme Court of South Dakota, warehousemen electing to come under the Federal Act need serve but one master, and that one the federal agency. *In re Farmers Cooperative Assn.*, 69 S. D. p. 202, 8 N. W. 2d p. 562. The cooperation which the Secretary was authorized to undertake with state officials was cooperation in harmonizing the exclusively federal and the exclusively state systems of regulation.

---

[12] That is, of course, subject to those express exceptions in the Warehouse Act which subject phases of the business to state law. See *e. g.*, §§ 18 and 20.

In this view of the Act, Congress formulated a policy on numerous phases of the warehouse business.[13]   The policy on rates was not the fixing of them but control over them through issuance, suspension, or revocation of licenses. Dual or conflicting positions of warehousemen were regulated by disclosure, by general prohibitions against discrimination between customers, by control over the license. Unsafe and inadequate warehouses were protected by the power of the Secretary to determine whether the warehouses of applicants or licensees were suitable.   Mixing of grain was authorized under specified conditions and prohibited under others.   On each of the nine matters charged in the complaint and listed above Congress legislated. And as we read the Act, Congress in effect said that the policy which it adopted in each of the nine was exclusive

---

[13] The basic program reflected in the Act was described in H. R. Rep. No. 60, 64th Cong., 1st Sess., p. 1, as follows:

"The outbreak of the European war emphasized the fact that the farm marketing machinery of this country is seriously weak, insufficient, and inadequate—a condition which already had been more or less recognized by students of farm economics.   From a very thorough study of our system of marketing there will appear: (1) A lack of adequate storage facilities; (2) a lack of proper control and regulation of such storage systems as exist; (3) an absence of uniformity in their methods of operation and the form of receipts issued; (4) a multiplicity of standards for grading and classification, or in some cases an entire absence of such standards for grading and classification; (5) a lack of disinterested graders, classifiers, and weighers; (6) a lack of proper relationship between the storage and banking systems of the country.

"The inauguration under this bill of a permissive system of warehouses licensed and bonded under authority of the Federal Government for the storage of staple and nonperishable agricultural products upon which uniform receipts may be issued, the weights and grades of the products specified therein having been previously determined by licensed weighers and graders in accordance with Government standards, would go far in the direction of standardizing warehouse construction, storage conditions, insurance, accounting, financing, and the handling and marketing of farm products."

of all others; and that if a licensed warehouseman complied with each requirement, he did all that he need do. He could not be required by a State to do more or additional things or conform to added regulations, even though they in no way conflicted with what was demanded of him under the Federal Act. We recently noted that Congress can act so unequivocally as to make clear that it intends no regulation except its own. *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767. In these fields Congress has done just that by the 1931 amendments.

Thus, by eliminating dual regulation and substituting regulation by one agency, Congress sought to achieve "fair and uniform business practices" which, as noted in *Federal Compress Co.* v. *McLean, supra,* p. 23, was the purpose of the amended Act.

The test, therefore, is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act. If it is, the federal scheme prevails though it is a more modest, less pervasive regulatory plan than that of the State. By that test each of the nine matters we have listed is beyond the reach of the Illinois Commission, since on each one Congress has declared its policy in the Warehouse Act. The provisions of Illinois law on those subjects must therefore give way by virtue of the Supremacy Clause. U. S. Const., Art. VI, Cl. 2.

*Second.* There were matters, other than those we have mentioned, which were charged in the complaint before the Commission.

(1) Failure to secure prior approval of the Illinois Commission for management, construction, engineering, supply, financial and other contracts between respondents and affiliates. Such approval is said to be required by § 8 (a) (3) of the Public Utilities Act.

(2) Failure to secure prior approval of contracts and leases between respondents and other public utilities. Such approval is said to be required by § 27 of the Public Utilities Act.

(3) Failure to secure approval of issuance of securities payable at periods of more than twelve months after date. Such approval is said to be required by § 21 of the Public Utilities Act.

These regulatory measures, it is said, are designed to prevent unwarranted drains on utility funds or the creation of unsound financial structures which would affect the ability of warehousemen to render adequate service at reasonable rates.

The United States Warehouse Act contains no provisions relating expressly to these three matters. And we are told that the Secretary of Agriculture has made no attempt to exercise any jurisdiction over them. But possibilities of conflict and repugnancy are conjured up. It is stated, for example, that the Secretary might determine that a warehouseman could not offer suitable warehouse service without an addition to his warehouse, that the financing of an addition might require the warehouseman to issue securities, that state disapproval of the issue might prevent the licensee from making the required additions. But it will be time to consider such asserted conflicts between the State and Federal Acts when and if they arise. Any such objections are at this stage premature. Congress has not foreclosed state action by adopting a policy of its own on these matters. Into these fields it has not moved. By nothing that it has done has it preempted those areas. And see *Federal Compress Co.* v. *McLean, supra,* p. 23. In more ambiguous situations than this we have refused to hold that state regulation was superseded by a federal law. *Penn Dairies, Inc.* v. *Milk Control Commission,* 318 U. S. 261.

We accordingly affirm in part and reverse in part the judgment of the Circuit Court of Appeals and remand the cause to the District Court for proceedings in conformity with this opinion.

*So ordered.*

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE RUTLEDGE concurs, dissenting.

More than seventy years ago this Court upheld the regulation of grain warehousing rates by Illinois and did so despite the relation of the great grain elevators to interstate commerce. *Munn* v. *Illinois,* 94 U. S. 113; and see *Budd* v. *New York,* 143 U. S. 517. State regulation of grain elevators had become so much part of our economic and political fabric, and so important was it deemed that the State laws remain in full force, that when Congress, in 1916, passed the first Warehouse Act (Part C of the Act of August 11, 1916, 39 Stat. 446, 486), it made that Act subordinate to the requirements of State laws. The Court now holds that by the 1931 Amendment to that Act, 46 Stat. 1463, Congress not only made the federal legislation independent of State law to the full scope of federal regulation, but also nullified the extensive network of State laws regulating warehouses, even though such laws, in their actual operation, in nowise conflict with the operation of the federal law. The Court thereby uproots a vast body of State enactments which in themselves do not collide with the licensing powers of the Secretary of Agriculture. It does so on the ground that Congress, by the 1931 Amendment, provided that "the power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this Act shall be exclusive with respect to all persons securing a license hereunder so long as said license remains in effect."

The decision of the case turns on the "power, jurisdiction, and authority" that Congress has deposited with the Secretary of Agriculture to the exclusion of action by a State. I could understand, though that is not my view, a holding that once a warehouseman chooses to obtain a federal license, he is quit of amenability to State law relating to the business of warehousing as such. On the other hand, the Amendment of 1931 may be read, without violence to its language, as designed not to displace all State regulation of warehousing, but merely to prevent conflict or even concurrence as to the very matters with which the Secretary of Agriculture can deal. This would leave State law to operate where it could without impinging on the limited regulatory functions assumed by the Federal Government. Such is my view. The Court's conclusion is a kind of admixture of these two views. Today's decision, apparently, does not altogether free federally licensed warehouses from State warehouse regulation, nor yet subject them to State laws, even though these State laws may harmoniously function without impinging on the licensing powers of the Secretary. To my way of thinking, the justification for conceding an undefined area to the States equally justifies leaving to the States all that is not irreconcilable with the full exercise of the licensing authority given to the Secretary of Agriculture.

The facts of the case are not in dispute. Rice, an owner and shipper of grain, filed with the Illinois Commerce Commission a complaint charging respondent warehouse owners with violations of the Illinois Public Utility Act (Ill. Rev. Stats. 1945, c. 111-2/3), the Illinois Grain Warehouse Act (Ill. Rev. Stats. 1945, c. 114 §§ 293-326 (a)), and Art. XIII of the Illinois Constitution. The violations charged include operation without a State license, exaction of unreasonable rates, failure to publish rates, failure to provide appropriate facilities, improper

mixing of grades, discrimination in rates, and conflict of interests as grain-dealer and warehouseman. The respondents moved to dismiss the complaint on the ground that federal license placed them under the exclusive jurisdiction of the United States Warehouse Act, and the State's authority was entirely superseded. Upon denial of this motion by the Illinois Commerce Commission, respondents applied to the United States District Court for an injunction against further State proceedings. What is before us is the ruling of the Circuit Court of Appeals that the District Court had erred in not granting the injunction.

This Court now orders the proceedings before the Illinois Commerce Commission to be enjoined, without knowledge on our part what it is that Illinois would exact of respondents. It has not yet been decided by the authoritative voice of Illinois law, the Supreme Court of Illinois, which of her regulatory requirements would survive respect by that Court for the controlling federal Act. This Court has heretofore acted on the wise rule that it will not "assume in advance that a State will so construe its law as to bring it into conflict with the federal Constitution or an act of Congress." *Allen-Bradley Local* v. *Board,* 315 U. S. 740, 746. The suit in the District Court was, in any event, premature. It should, on familiar principles, be ordered held in the District Court until the claim of Illinois may be authoritatively ascertained in the State courts, thereby perhaps avoiding a claim of conflict between State and federal legislation. Compare the series of cases from *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478, to *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101.

On the merits of the controversy our problem is to determine what freedom to regulate its grain warehouses has been left to Illinois, after Congress exercised its constitu-

tional power over such warehouses by adopting a licensing system to be administered by the Secretary of Agriculture under closely defined authority. Underlying the problem is the important fact that we are concerned with an economic enterprise which, while it has important radiations beyond State bounds, does not thereby lose special relations to the State in which it is conducted. And so we have once more the duty of judicially adjusting the interests of both the Nation and the State, where Congress has not clearly asserted its power of preemption so as to leave no doubt that the separate interests of the States are left wholly to national protection.

The general considerations to be taken into account in striking a balance, and not to be acknowledged merely platonically, have been indicated in my opinion in *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767. Suffice it to say that due regard for our federalism, in its practical operation, favors survival of the reserved authority of a State over matters that are the intimate concern of the State unless Congress has clearly swept the boards of all State authority, or the State's claim is in unmistakable conflict with what Congress has ordered.

Assuming that the undefined scope of Illinois law covers all the relief sought before the Illinois Commission, it is not suggested that there is actual conflict between the limited federal control through the licensing device and the policy of Illinois. Indeed, it seems to be admitted that the enforcement of the State Act might well effectuate, at least in some aspects, the policy of the federal statute. Moreover, despite a statement in the House Report that the purpose of the 1931 Amendment was to make the Act "independent of any State legislation on the subject" (H. Rep. No. 2314, 70th Cong., 2d Sess., p. 4), the Court does not find that in making "the power,

jurisdiction, and authority conferred upon the Secretary of Agriculture . . . exclusive with respect to all persons securing a license" Congress insulated such licensed warehousemen from further regulation by a State. What the Court holds is that if Congress has touched a subject matter it becomes untouchable by the State, though there is neither paper nor operating conflict between federal and State spheres of authority. Thus, while Congress has not given to the Secretary of Agriculture rate-fixing power, Congress, it is said, has inferentially deprived Illinois of the power she has exercised for seventy years to fix grain warehouse rates.

I cannot agree. As to rates, for example, Congress has merely given the Secretary power to revoke a license if its holder charges "unreasonable or exorbitant" rates. The practical assumption, I submit, is not that Congress has put an end to the tried machinery for rate-fixing by the States without putting another in its place. It is rather that it would permit its licensing authority to avail itself of the facilities of the established rate-fixing agencies of the States and cooperate with them in ascertaining whether Illinois licensees *are* charging "unreasonable and exorbitant" rates. Such would be the practicalities of government where both State and Nation have converging yet separate interests, and such authorized collaboration between national and State governments should be the assumption in construing the Act unless Congress has left no doubt that it was so bent on avoidance of all possible conflict that it left no room for concert. Indeed, the very section which confers "exclusive" authority upon the Secretary of Agriculture authorizes him "to cooperate with State officials charged with the enforcement of State laws relating to warehouses . . . ." 46 Stat. 1465.

By the United States Warehouse Act, Congress did not undertake a general, affirmative regulation of warehouses,

even remotely comparable to its regulation of other public utilities. The Act was initiated as warehouse receipts legislation, written with the Uniform Warehouse Receipts Act in mind. Neither the language nor the history of the 1931 Amendment marks a departure from the basic design and policy of the legislation. Congress did not see fit to establish a compulsory, uniform, nation-wide system for the regulation of grain warehouses, essential links though they be in the chain of interstate commerce. Nor did Congress authorize the Secretary of Agriculture to formulate and enforce such a system. Even in its limited aspect, the Act does not apply to all warehouses affecting interstate commerce. Indeed, Congress exercised no compulsion over any warehouse. Congress merely offered to those who desired it the privilege of being a federal licensee. Anyone who wished might continue to operate as a warehouseman without a federal license. As to these there is no question but that State law controls. And even those who obtain a federal license cannot be compelled to perform any positive duties. Except for certain penalties for fraud, the only sanction for disobedience of the few duties imposed is loss of the license.

Congress was content to allow two warehousemen in similar circumstances to operate under different rules if one chose to seek a federal license and the other did not. It offered perquisites incident to such a license to a warehouseman who wanted them. Such a scheme does not persuasively indicate a purpose to free such a federal licensee from regulations to which others are subject and which are not in practical conflict with the requirements of the federal law. For instance, has Congress really expressed with reasonable clarity its purpose to forbid to the States the fixing of warehouse rates and thus deprive the States of a long-standing regulatory power which the United States chose not to assume? Is it not more con-

sistent with a proper regard for the interplay of State and national interests to assume that Congress was imposing a minimum of regulation for those who accepted federal licenses rather than to assume that by inferential sterilization of State laws Congress meant to make its optional and restricted requirements the maximum? The "power, jurisdiction, and authority" of the Secretary of Agriculture which after 1931 was to be "exclusive" are given full and fair scope if made to refer only to powers that the Secretary can effectively exercise. There is exclusion of State power as to what the Act, substantively speaking, includes, but not exclusion of a vast potential field of warehouse regulation, not within the active range of federal administration, simply because Congress dealt with a small part of it, and that only conditionally.

Nor is there anything in the history of the federal Act which requires such destructive consequences to a longstanding body of State enactments. When the 1916 Act was passed, Congress emphasized the need for State regulation by subordinating federal action to such regulation. By 1931 forty States had laws regulating warehouses, laws which at least in some aspect did not conflict with the powers vested in the Secretary of Agriculture. An impressively large number of States fixed warehouse rates. The Court now finds in the legislative history of the 1931 Amendment a purpose to wipe out all these regulations as to the holders of federal licenses.

That Amendment eliminated the subservience of the federal Act to the laws of the States, for such subservience really nullified the practical purposes at which Congress aimed in 1916 by a voluntary federal licensing system. The purpose was to make "the Federal act independent of State laws," and to "place the Federal act on its own bottom." While such language in a Committee Report, treated merely as words, might be interpreted as an im-

plicit, roughshod decimation of State authority over any aspect of warehousing which the federal licensing system touched, howsoever meagerly and indirectly, it is more consonant with a due regard for federal-State relations to find that the dominating object of the legislation controls what was meant by "independent of State laws." For the dominant object was removal of those matters which were entrusted to the Secretary of Agriculture from subordination to State action. By saving the authority which it had given to the Secretary of Agriculture from being rendered futile by State laws, Congress ought not to be held to have nullified State laws whose continuing force would not hamper the Secretary of Agriculture in exercising the powers that Congress gave him. Evidence is lacking that Congress felt that the correction of the inadequacy which had revealed itself regarding the 1916 Act required withdrawal of federal license holders from the requirements of non-conflicting State regulation. So long as full scope can be given to the amendatory legislation without undermining non-conflicting State laws, nothing but the clearest expression should persuade us that the federal Act wiped out State fixation of rates and other State requirements deeply rooted in their laws. When neither the mischief at which the 1931 Amendment was directed, nor the policy, terms and structure of warehousing legislation by Congress in its entirety necessitate it, disregard of the delicate balance of Federal-State relations ought not to be attributed to Congress.

If so fundamental a change were designed, it would normally be reflected in the financial provisions made by Congress, and in the reports on the administration of the Act. The appropriations for administering the United States Warehouse Act show no substantial increase as a consequence of the 1931 Amendment. For the years pre-

ceding and those immediately following the Amendment, the appropriations were:

| | | |
|---|---|---|
| 1929 (45 Stat. 539, 563) | ............... | $240, 320 |
| 1930 (45 Stat. 1189, 1214) | ............. | 256, 000 |
| 1931 (46 Stat. 392, 419) | ............... | 241, 000 |
| 1932 (46 Stat. 1242, 1270) | ............. | 312, 200 |
| 1933 (47 Stat. 609, 638) | ............... | 313, 020 |
| 1934 (47 Stat. 1432, 1460) | ............. | 296, 220 |
| 1935 (48 Stat. 467, 494) | ............... | 271, 383* |

Moreover, those charged with the enforcement of the Act seem to have been unmindful of the far-reaching consequences now imputed to it. The reports of the Secretary of Agriculture, of the Chief of the Bureau of Agricultural Economics, and of the Chief of Agricultural Marketing Service, for the years after 1931, disclose administrative attitudes and practices no different from those of preceding years. No mention is made of the State laws which, the Court now holds, were superseded though not conflicting with federal administration. In citing the advantages incident to a federal license, no mention appears of so important an item as relief from existing State regulations.

The history of the federal act shows that at no time has Congress deemed it desirable to introduce compulsory uniformity of warehouse regulation. By freeing federal licensees from overriding State regulation Congress was not by indirection seeking to create such a uniform system. But the effect of the interpretation now given to the 1931 Amendment is the establishment of uniformity of non-regulation, in that it introduces *laissez faire* outside the very narrow scope of the Secretary's powers. It is easy to exaggerate the danger of undesirable consequences flowing

---

*The more substantial increases in appropriation after 1935 seem to be due to an increase in the volume of licensing, not to an extension of the fields of supervision.

from a rejected construction. But surely one does not draw on idle fears in suggesting that as a result of today's decision the gates of escape from deeply rooted State requirements will be open, although Congress itself has not authorized federal authority to take over the regulation of such activities and though their State enforcement does not at all conflict with, but rather promotes, the limited oversight of warehouses thus far assumed by the Federal Government. The Court displaces settled and fruitful State authority though it cannot replace it with federal authority.