HANNI, Appellant,

v.

CLEVELAND ELECTRIC ILLUMINATING COMPANY, Appellee.

[Cite as *Hanni v. Cleveland Elec. Illum. Co.* (1993), 87 Ohio App.3d 295.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 62258.

Decided April 21, 1993.

*Friedman & Gilbert* and *Terry H. Gilbert,* for appellant.

*Squire, Sanders & Dempsey* and *Helen Kryshtalowych,* for appellee.

HARPER, Judge.

Plaintiff-appellant, Brian D. Hanni, appeals from a summary judgment entered by the Court of Common Pleas of Cuyahoga County in favor of defendant-appellee, Cleveland Electric Illuminating Company ("CEI"), on his wrongful discharge claim. A careful review of the record compels affirmance of the trial court's judgment.

CEI hired appellant in June 1982 as a testing inspector. Appellant worked at the Perry Nuclear Power Plant ("Perry"), Perry, Ohio for a period of seven years without incident. Appellant was never reprimanded, suspended or otherwise disciplined for failing to perform his duties. He was promoted on July 18, 1988 to a Senior Engineering Technician from a Senior Engineering Aide and received fine performance appraisals as late as June 19, 1989.

However, in that same month, June 1989, John R. Balmat, CEI's Security Advisor at Perry, discovered alleged questionable conduct on behalf of appellant. Balmat's job duties included conducting investigations of Perry employees and the reporting of the results of the investigations to the proper personnel. Balmat's investigation revealed that appellant was arrested on May 13, 1989 by Geneva-on-the-Lake police officers for a number of offenses. Appellant was subsequently charged with two felonies, aggravated felonious assault and felonious assault. Appellant was further charged with six traffic offenses, including driving under the influence of alcohol and driving without a valid driver's license.

As a result of these findings, Gene Parker and Leo Minter, two of appellant's supervisors, met with appellant on June 8, 1989. They informed him that his unescorted access badge was being revoked and that this action was required by both Perry policy and Nuclear Regulatory Commission ("NRC") regulations when CEI doubts the employee's trustworthiness and reliability.

Balmat continued his investigation of appellant's conduct outside the employment setting. On June 20, 1989, Balmat reported the following findings. A check with the Ohio Bureau of Motor Vehicles revealed that appellant's driver's license was suspended in 1984 for failure to obtain insurance coverage and in 1987 for driving under the influence. Even though appellant's license was suspended for a period of over three years, appellant continued to drive when he deemed it necessary. Balmat then opined that "[i]f Hanni is operating a personal motor vehicle to his job at PNPP [Perry], he has been doing so illegally which would reflect upon his overall trustworthiness and reliability."

Balmat's investigation and reports prompted the appellant's suspension without pay on June 30, 1989. He was subsequently discharged on July 7, 1989.

On February 27, 1990, appellant filed a complaint in the trial court in which he set forth three causes of action. Appellant pled a wrongful discharge claim in count one of the complaint. In count two, he alleged that CEI defamed his reputation by indicating to prospective employers that he was untrustworthy and unreliable as a Quality Assurance Inspector/Engineer. Finally, appellant charged in the third count that CEI intentionally inflicted emotional distress upon him in discharging him as an employee.

In addition to an answer, CEI later filed a partial motion for summary judgment on March 4, 1990 in which it sought judgment on appellant's defamation and intentional infliction of emotional distress claims. A second partial motion for summary judgment on appellant's wrongful discharge claim was filed on March 15, 1990.

The trial court issued an order on July 12, 1991 granting CEI's motion for summary judgment on all three claims. Appellant now appeals from the ruling on the wrongful discharge claim only and assigns error as follows:

"I.   The trial court's dismissal of plaintiff's claim for wrongful discharge on the grounds that Congress intended to abolish the tort of wrongful discharge by enacting 10 C.F.R. Section 10 constitutes reversible error because it relies upon a flat misreading of 10 C.F.R. Section 10, and contradicts virtually all federal authority on the doctrine of preemption.

"A.   Federal Regulation 10 C.F.R. Section 10.1(A) makes explicit that Congress affirmatively intended to avoid federal involvement in the employment aspects of non-NRC employees such as Plaintiff. Moreover, even to the extent that the 'trustworthiness' criteria govern security access for employees in Plaintiff's case, congress never intended to abolish state law remedies for injury resulting from the tortious application of these criteria.

"B.   Federal preemption is a conservative doctrine which may not be implied without a showing that Congress intended to preempt state regulation.

"II.   The trial court's ruling that 'plaintiff has not demonstrated that [genuine] issues of material fact exist as to the bases for action in the complaint' is plainly erroneous.

"A.   It is reversible error on a motion for summary judgment for the trial court to view the facts other than in their totality, and in a light most favorable to the non-moving party.

"B.   Whether or not promissory estoppel arose based on oral promises made at the hiring interview and subsequent evaluations of Plaintiff's job performance depends on a jury determination of whether CEI should have reasonably expected its representations to be relied upon by Plaintiff, and whether the expected action or forbearance resulted and was detrimental to the Plaintiff.

"C.  Whether an oral at will employment agreement has been modified by the doctrine of implied contract is a question of fact for the jury *based upon the facts and circumstances surrounding [the] oral at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy or any other fact which may illuminate the question.*  [Emphasis *sic.*]

"D.  Whether or not defendant was discharged for just cause is a factual determination to be decided by the trier of fact."

The trial court stated in its opinion that the NRC regulations are an attempt to ensure that nuclear power plants are operated safely.  Inherent therein is the requirement that an employee of a nuclear power plant is subject to dismissal if he or she is untrustworthy or unreliable.  Further, " 'the decision as to access authorization * * * is a comprehensive, common-sense judgment * * *.'  10 C.F.R. 10.10."  The court concluded, "[t]here is no genuine issue that a reasonable person could conclude, based on plaintiff's record of driver's license suspensions and continuing to drive without a license, that he was not trustworthy and not reliable."

Appellant submits the trial court's "sweeping rule," that federal law authorizes the discharge of an employee where there is a factual basis to conclude that the employee is untrustworthy or unreliable, ignores the distinction between private employees and NRC employees as outlined in Section 10.1, Title 10, C.F.R. Appellant thus asserts that Congress did not abolish the state tort of wrongful discharge because it expressly excluded non-NRC employees from coverage under Section 10.1, Subpart A, which reads in pertinent part as follows:

"This part establishes the criteria, procedures, and methods for resolving questions concerning:

"(a) The eligibility of individuals who are employed by or applicants for employment with NRC contractors, agents, and licensees of the NRC * * * for access to restricted data pursuant to the Atomic Energy Act of 1954 * * *; and

"(b) the eligibility of NRC employees, or the eligibility of applicants for employment with the NRC, for employment clearance.  * * * "

NRC regulations thus require that a NRC licensee evaluate whether any employee should be allowed unescorted access to sensitive areas of a nuclear power plant.  Sections 10.10(a), (d)(1), and 10.11, Title 10, C.F.R., provide the employer with the following guidelines with regard to this evaluation:

"Section 10.10  Application of the criteria.

"(a) The decision as to access authorization and/or employment clearance is a comprehensive, common-sense judgment, made after consideration of all the

information, favorable or unfavorable, relevant to whether the granting of access authorization and/or employment clearance would not endanger the common defense and security and would be clearly consistent with the national interest.

" * * *

"(d) In resolving a question concerning the eligibility or continued eligibility of an individual for access authorization and/or employment clearance, the following principles shall be applied by the Director, Division of Security, Hearing Examiners, and Personnel Security Review Examiners:

"(1) Information reasonably tending to establish the truth of one or more of the items in the criteria shall be the basis for recommending denial or revocation of access authorization and/or employment clearance unless evidence to support faith in the individual's reliability and trust-worthiness is affirmatively shown.

" * * *

"Section 10.11   Criteria.

"(a) The criteria for determining eligibility for access authorization and/or employment clearance shall relate, but not be limited, to the following where an individual:

" * * *

"(9) Has been convicted of a crime, or has a background, where the facts, circumstances, or conduct are of a nature indicating poor judgment, unreliability, or untrustworthiness.

" * * *

"(13) Engaged in any other conduct or is subject to any other circumstances which tend to show that the individual is not reliable or trustworthy, or which furnishes reason to believe that the individual may be subject to coercion, influence, or pressures which may cause the individual to act contrary to the national interest."

Once an individual is no longer eligible for access authorization as permitted by Section 10.10, Title 10, C.F.R., the licensee must terminate that authorization. Section 25.33(a)(3), Title 10, C.F.R.

██  In the present case, Alvin Kaplan, Vice President of System Engineering and Control Group at CEI, testified in his deposition as follows:

"Q.   All right.   Now, I want you to tell me what it was that led you to believe that he was untrustworthy based on the investigation.   * * *

"A.   I indicated to you before that I reviewed the information.   I don't recollect all the details.   What I do recollect is that there was a driving without a

license, which is a conscious violation of a law, there was the DWI that you refer to, and there was the initial incident.

"  *   *   *

"In performing duties in a nuclear power plant you are required to follow procedures, and you are required to follow the procedures as they are written. When you are driving an automobile after your license is revoked, you are essentially violating procedures, law, whatever, and there's a commonality of thought process there."

Kaplan found appellant's conduct, *i.e.*, defying the law by continuing to drive an automobile when he was not properly licensed to do so, to constitute a lack of respect for rules and regulations. Fearing that appellant's defiance would expand to include defiance of nuclear regulations, appellant's supervisors chose to revoke his access authorization. Therefore, a review of the record discloses that CEI was well within its rights to revoke appellant's access authorization pursuant to Section 10.25(a)(3), Title 10, C.F.R., after a review of the guidelines presented in Sections 10.10 and 10.11, Title 10, C.F.R.[1]

Appellant continues to contest the trial court's ruling by proffering that even though his authorization may have been properly revoked, the federal regulations do not mandate his dismissal. He argues that the federal regulations cannot preempt Ohio law, including the employment-at-will doctrine and the exceptions to this doctrine. The issue we must, therefore, address is whether the federal government preempted appellant's state-law tort claim for wrongful discharge.

State law is preempted in three situations pursuant to the Supremacy Clause of the United States Constitution. First, since preemption is generally a question of congressional intent, see *Schneidewind v. ANR Pipeline Co.* (1988), 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316, 324, Congress may use explicit language of preemption in its enactments. See *Shaw v. Delta Air Lines, Inc.* (1983), 463 U.S. 85, 95–98, 103 S.Ct. 2890, 2898–2899, 77 L.Ed.2d 490, 499–501. Second, even if explicit statutory language is not present, Congress's intent to preempt state law can be gleaned from a scheme of federal regulation. This intent may thus be inferred if this scheme is " ' * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement

---

1. Appellant interjects in his appellate brief, although he does not assign this as error, the trial court's resolution of material facts which were allegedly in dispute. Specifically, appellant suggests that he was not allowed to cross-examine the officers who arrested him on May 13, 1990. The events of May 13, 1990 were not relevant to CEI's ultimate decision to release appellant as an employee. Rather, CEI based its decision on appellant's habit of driving while under suspension, an act freely admitted by appellant himself.

it,' because 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.'" *Fidelity Fed. S. & L. Assn. v. De la Cuesta* (1982), 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675, quoting *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459. Finally, preemption of a state law is also manifested when it conflicts with federal law. Preemption has, therefore, been found when a private party cannot comply with both federal and state law, see, *e.g., Florida Lime & Avocado Growers, Inc. v. Paul* (1963), 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 256–257, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz* (1941), 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587.

■ The Supreme Court, in *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.* (1983), 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752, recognized that Congress, in passing the Atomic Energy Act of 1954, 68 Stat. 919, as amended, Section 2011 *et seq.*, Title 42, U.S.Code ("the Act"), intended that the regulation of the radiological and safety aspects involved in a nuclear power plant's construction and operation was the responsibility of the federal government. *Id.* at 205, 103 S.Ct. at 1722, 75 L.Ed.2d at 765. The individual states, however, were meant to retain the traditional responsibility of regulating electrical utilities with regard to questions of state related concerns such as need, reliability and cost. *Id.*

■ Further, when Congress determined that the private sector should play a role in the development of atomic energy under federal regulation and control, the Act provided for the licensing of private construction, ownership, and operation of commercial nuclear power facilities. *Duke Power Co. v. Carolina Environmental Study Group, Inc.* (1978), 438 U.S. 59, 63, 98 S.Ct. 2620, 2625, 57 L.Ed.2d 595, 604. The " * * * prime area of concern in the licensing context * * * is national security, public health, and safety." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.* (1978), 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460, 483. Therefore, the federal government is solely responsible for the safety of nuclear technology. *Pacific Gas & Elec., supra,* 461 U.S. at 208, 212, 103 S.Ct. at 1724, 1726, 75 L.Ed.2d at 768, 770.

Section 10.1, Title 10, C.F.R. specifically governs the resolution of questions concerning employment eligibility of individuals employed by NRC licensees. Sections 10.10 and 10.11, Title 10, C.F.R. clearly demonstrate the federal government's interest in ensuring that nuclear plant personnel are given either access authorization or employment clearance by first analyzing the criteria set forth

therein. The criteria to be analyzed include an employee's conduct outside the employment arena which indicates poor judgment, unreliability or untrustworthiness. Section 10.11(a)(9), (13), Title 10, C.F.R. The ultimate decision to grant employment clearance is one based on common sense and one that must be clearly consistent with the national interest. Section 10.10(a), Title 10, C.F.R.

This framework establishes that, in the within case, CEI cannot be prohibited from either revoking appellant's access authorization or his employment clearance when it found that appellant's behavior indicated a willingness to foreclose mandated procedures. Such prohibition would undermine the federal government's regulations in the area of nuclear safety because it is expressly stated that a lack of reliability or trustworthiness is relevant to the NRC's interest in assuring the safe operation of these facilities. As such, the federal regulations preempt the state tort law of wrongful discharge because CEI, under these circumstances, could not accomplish and execute the objectives of the regulations if it were susceptible to state wrongful discharge claims.

Appellant relies primarily on the Supreme Court cases of *Silkwood v. Kerr–McGee Corp.* (1984), 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443, and *English v. Gen. Elec. Co.* (1990), 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65, in arguing that state law was not preempted in this case. An analysis of both of these cases, however, reveals that they are clearly distinguishable.

In *Silkwood,* the court determined that a state-authorized award of punitive damages which arose from the escape of plutonium from a federally licensed nuclear facility was not preempted by any federal provision. A review of the Act illustrated that Congress was silent as to any federal remedy for persons exposed to radiation as a result of a facility's non-compliance with NRC's regulations. *Id.,* 464 U.S. at 251, 104 S.Ct. at 622, 78 L.Ed.2d at 454. In addition, even though the Price–Anderson Act, passed by Congress in 1957, did not apply to the case specifically, the court reviewed the discussion preceding its enactment which indicated that victims of a nuclear accident were able to employ state tort law remedies. *Id.* at 252, 256, 104 S.Ct. at 623, 625, 78 L.Ed.2d at 455, 457. The court thus limited its finding that state tort law was not preempted " * * * insofar as damages for radiation injuries are concerned, * * * " *id.* at 256, 104 S.Ct. at 626, 78 L.Ed.2d at 457–458, because no conflict or frustration presented itself between the federal and state standards. Whereas, in the instant case, CEI would be unable to conform to federal regulations if it abided by state law standards regarding "just cause" and wrongful discharge.

In *English,* the court found that an employee's state claim for intentional infliction of emotional distress was not preempted by any federal provision

because the state tort law was not motivated by safety concerns. *English,* 496 U.S. at 84–85, 110 S.Ct. 2278 at 110 L.Ed.2d at 77–78. In noting that "for a state law to fall within the preempted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels," *id.,* the effect of the state remedy, with its intended purpose to protect "whistleblowers" from retaliatory action, was neither direct nor substantial. *Id.* Here, impeding CEI's ability to discharge an employee pursuant to NRC regulations which are expressly aimed at promoting safety in nuclear facilities, is a direct and substantial interference with those regulations.

Accordingly, appellant's first assignment of error is overruled as the trial court correctly concluded there is no genuine issue in dispute as to whether appellee properly terminated appellant's employment pursuant to federal regulations.

In his second assignment of error, appellant contends that the trial court erred in concluding, "plaintiff has not demonstrated that [genuine] issues of material fact exist as to the bases for action in the complaint." Appellant suggests that he introduced evidence of the elements required to prove either promissory estoppel or an implied contract thereby precluding the entry of summary judgment in favor of CEI on the wrongful discharge claim. He also submits that whether CEI terminated him for "just cause" is a factual determination to only be decided by the trier of fact, thus precluding a summary judgment.

This court's disposition of appellant's first assignment of errors renders this subsequent error moot. We, therefore, need not address it. App.R. 12(A)(1)(c).

*Judgment affirmed.*

JOHN F. CORRIGAN, P.J., and JAMES D. SWEENEY, J., concur.