**BERMAN ENTERPRISES, INC., General Marine Transport Corp., Standard Marine Services, Inc., Jane Frank Kresch, as Secretary of Berman Enterprises, Evelyn Berman Frank, as Chief Executive Officer of General Marine Transport and as an officer of the other named corporations, and Peter M. Frank, as President of General Marine Transport, Plaintiffs,**

**v.**

**Thomas C. JORLING, Commissioner of the New York State Department of Environmental Conservation, and Langdon Marsh, Executive Deputy Commissioner of the New York State Department of Environmental Conservation, Defendants.**

**No. CV 91–2789.**

United States District Court, E.D. New York.

May 19, 1992.

Graham & James, by Christopher R. Carpentieri, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of State of N.Y., by Stuart Miller, Asst. Atty. Gen., Environmental Protection Bureau, New York City, for defendants.

## MEMORANDUM, ORDER AND JUDGMENT

### JACK B. WEINSTEIN, District Judge:

By authority of New York's complex of environmental statutes and rules, plaintiffs, regarded by the state as persistent polluters, have been put out of the business of transporting petroleum and petroleum products on New York's waterways. Claiming violation of their federal rights, they seek damages and permission to restart their business. For the reasons indicated below, the case must be dismissed. Plaintiffs are left to pursue remedies in state court.

### I. FACTS

Plaintiff Standard Marine Services, Inc. is a Delaware corporation whose principal place of business is New York. It is the corporate parent of plaintiffs Berman Enterprises, a New York corporation, and General Marine Transport Corp., a New Jersey corporation. The corporations own barges used for the transportation of oil. The remaining plaintiffs are or were officers of Berman and General Marine.

On September 27, 1990, one of the plaintiffs' barges sank in the Arthur Kill, a waterway between New Jersey and Staten Island. An oil spill resulted. Pursuant to New York Environmental Conservation Law § 71–0301, defendant Jorling, the Commissioner of the Department of Environmental Conservation (DEC), issued a Summary Abatement Order on October 18, 1990. The order called for the plaintiffs to cease immediately the operation of vessels involved in petroleum transportation.

Section 71–0301 grants the Commissioner broad power to act summarily to abate environmental hazards. It provides in part:

Notwithstanding any inconsistent provisions of law, whenever the commissioner finds, after investigation, that any person is causing, engaging in or maintaining a condition or activity which, in his judgment, [1] presents an imminent danger to the health or welfare of the people of the state or results in or is likely to result in irreversible or irreparable damage to natural resources, and [2] relates to the prevention and abatement powers of the commissioner and it therefore appears to be prejudicial to the interests of the people of the state to delay action until an opportunity for a hearing can be provided, the commissioner may, without prior hearing, order such person ... to discontinue, abate or alleviate such condition or activity, and thereupon such person shall immediately discontinue, abate or alleviate such condition or activity.

*Id.* (bracketed numbers added). Violators are subject to fines and may be enjoined from the violative activity. *See* 6 NYCRR § 620. Persons subject to a Summary Abatement Order must be granted a hearing as soon as possible within 15 days of the order at which they may offer proof that their activity is not threatening to the people or environment of the state.

The Summary Abatement Order in this case suspended indefinitely the operation of 14 vessels owned by plaintiff Berman and used for the transportation and storage of oil. It also required plaintiffs to remove all oil from the vessels within seven days. The Commissioner claimed that the plaintiffs' past violations of New York Navigation Law indicated that the continued operation of the vessels would likely result in unreported discharges of oil, toxic waste water or sewage sludge that would cause irreparable harm to the environment and people of New York.

The Summary Abatement Order also suspended licenses issued for the vessels under Article 12 of the New York Navigation Law and gave notice that, in light of plaintiffs' environmental record, the Commissioner intended to revoke the licenses altogether pursuant to powers provided in 17 NYCRR § 30.10(b).

Article 12, entitled "Oil Spill Prevention, Control, and Compensation," codified at §§ 170–97, establishes a licensing system

designed to assure prompt cleanup of oil spills through the creation of a cleanup fund. Section 174(1)–(4) prohibits the operation of any "major facility" without a state license. Major facilities are defined to include vessels that transfer petroleum to other vessels. *See* New York Navigation Law § 172(11). Licenses, which must be renewed each year, are issued upon submission by the licensee of a certificate providing information about a facility's operation and upon payment of licensing fees and surcharges indexed to the number of barrels of petroleum transferred to or from each major facility. The licensee's submissions must include a showing that it (1) is complying with, or taking steps to comply with, "state and federal plans and regulations for control of discharges of petroleum, and the containment and removal thereof" and (2) "can provide necessary equipment to prevent, contain and remove discharges of petroleum." *Id.* § 174(3) and (8). The DEC Commissioner is authorized to impose fines if the owner of a major facility fails to file a certificate or willfully falsifies information on a certificate. *Id.* § 174(7). Owners and operators of vessels that illegally discharge petroleum are liable for cleanup costs and damages. *Id.* § 181. In the event of a spill, either the state or affected individuals may conduct a cleanup and obtain compensation for the cost from a fund created by the collection of license fees, surcharges and fines. *Id.* §§ 176, 179.

In addition to suspending the vessels' operation and giving notice of the proposed license revocation, the Summary Abatement Order also gave notice, as required by section 71–0301, of a hearing to be conducted starting on October 30, 1990 at offices of the DEC. The hearing before an administrative law judge lasted through November. Additional time for document submissions was granted, and the record was closed on January 22, 1991. The judge considered whether the plaintiffs had violated section 71–0301 and whether their section 174 licenses should be revoked. Testimony and court records indicated that plaintiffs had repeatedly illegally dumped waste materials, operated unlicensed vessels, and withheld material information in obtaining operating licenses. Based on this record, the administrative law judge recommended upholding the Summary Abatement Order and license revocations. On March 25, 1991, defendant Executive Deputy Commissioner Marsh issued a Decision and Order to that effect.

In October 1990, upon receiving the Commissioner's Summary Abatement Order, plaintiffs filed an action in the United States District Court for the Southern District of New York challenging the Order. Plaintiffs' motion for a preliminary injunction was denied by that court. By joint stipulation, the parties dismissed that case without prejudice on November 6, 1991.

The current action was commenced in August of 1991. Plaintiffs' second amended complaint brings claims under 42 U.S.C. § 1983 for deprivation of liberty and property without due process of law. Relief obtainable in the state courts under Article 78 of the New York Civil Practice Law and Rules is sought under the court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

The crux of the complaint is that the Commissioner and Executive Deputy Commissioner's decisions to shut down the plaintiffs' oil transport business were driven by malice and were made without factual foundation and with inadequate procedural safeguards. Plaintiffs seek a declaration annulling the Summary Abatement Order and the license revocation, damages against the Commissioner and the Executive Deputy Commissioner personally and attorney's fees.

Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction or for failure to state a claim. The motion is based on eleventh amendment immunity, official immunity and various theories of abstention. At oral argument on the motion, plaintiffs raised the additional claim that the Summary Abatement Order and license revocation should be annulled because the statutes under which the Commissioner acted—Environmental Conservation Law § 71–0301 and Navigation Law § 174—are preempted by federal law. The court denied defendants' motion

to dismiss with leave to renew to allow for additional submissions and argument on the preemption issue. The issues have been fully briefed and argued.

## II. LAW AND APPLICATION TO FACTS

### A. ELEVENTH AMENDMENT

■ The eleventh amendment bars private citizens from suing states in federal court. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Officials sued in their personal capacity and local governmental bodies generally do not share in the states' immunity from federal court jurisdiction. *Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978). State executive branch agencies, however, generally are protected as organs of the state, at least insofar as "the governmental unit simply is functioning as the alter ego of the state in accomplishing some public purpose." 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3524, at 136 (2d ed. 1984).

[2] To prevent state officials from using the eleventh amendment to circumvent federal and constitutional law, the Supreme Court has lifted the bar in limited circumstances. *See generally Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06, 104 S.Ct. 900, 910–11, 79 L.Ed.2d 67 (1984) (discussing conflict between eleventh amendment and supremacy clause). Under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), acts of state officials that violate federal constitutional or statutory rights are deemed not to be acts of the state. Accordingly, *Young* allows actions in federal court to enjoin state officials from committing ongoing or future violations. *See Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Expenses of the litigation may in some circumstances be imposed upon the state ancillary to a claim for injunctive relief. *Quern v. Jordan*, 440 U.S. 332, 344–45, 99 S.Ct. 1139, 1147–48, 59 L.Ed.2d 358 (1979).

Because *Ex parte Young* was meant to balance federal supremacy and state immunity, however, the Supreme Court has carefully controlled its application. Suits against state officials that, in form or substance, seek compensatory damages (rather than prospective declaratory or injunctive relief) which will be paid with funds from the state treasury (rather than from the pockets of individual officials) remain barred. *Edelman*, 415 U.S. at 664, 94 S.Ct. at 1356; *see also Green v. Mansour*, 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985) ("a declaratory judgment is not available when the result would be a partial 'end run' around our decision in *Edelman*"). In addition, suits against state officials that allege violations of valid state law do not implicate the supremacy clause and will not be heard in federal court. *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911.

■ On its face, the complaint in this action appears to skirt the eleventh amendment bar because it is for declaratory relief and seeks damages only from the Commissioner and Executive Deputy Commissioner personally. In cases implicating the eleventh amendment, however, district courts are required to determine the real parties in interest by examining the substance of the action and its likely effect. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 463–64, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The primary goal of plaintiffs' action is not prospective injunctive relief: the events complained of have passed. Plaintiffs are asking in part for judicial review of a final agency decision that is specific only to them rather than injunctive relief from a continuing constitutional violation. *Cf. United States v. Yonkers Bd. of Educ.*, 893 F.2d 498, 503 (2d Cir.1990) (no bar to suit alleging ongoing race discrimination). Plaintiffs are also asking for millions of dollars in damages for the disruption of their oil transportation business. This portion of the complaint is not personal to the defendants. It concerns their official actions and the discretion granted them to act by duly enacted laws of New York. In reality, this is an action against

the state for judicial relief from a state agency decision and for compensatory damages that, if successful, would be paid by the state. It is therefore barred by the eleventh amendment. *Edelman,* 415 U.S. at 666, 94 S.Ct. at 1357.

## B. QUALIFIED IMMUNITY

■ Even if the suit is against the defendants in their personal capacity, they are afforded qualified immunity for violations of constitutional rights resulting from the exercise of official powers. *Butz v. Economou,* 438 U.S. 478, 499–504, 98 S.Ct. 2894, 2907–09, 57 L.Ed.2d 895 (1978); *cf. Sprecher v. Graber,* 716 F.2d 968, 976 (2d Cir. 1983). Under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), immunity for agency officials acting within the discretion granted them by the legislature will be found unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Simply alleging, as plaintiffs do here, that the defendants acted with a malicious intention to deprive them of their rights, is no longer sufficient after *Harlow. See id.* at 815–17, 102 S.Ct. at 2736–38 (rejecting "subjective" component of test for qualified immunity; "bare allegations of malice should not suffice"). Since even at this stage it is not clear that any federally created rights have been violated, the defendants are entitled to immunity.

## C. ABSTENTION

Dismissal is also warranted on grounds of abstention under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

### 1. *Burford*

■ Under *Burford,* federal courts should abstain from deciding questions of state law where it would hamper the states' efforts to establish a coherent regulatory scheme on issues of importance to the state. In *Burford* itself, Sun Oil Company had challenged decisions by the Texas Railroad Commission granting Burford permission to drill several oil wells. Since federal decisions would have substantially interfered with the Commission's regulatory procedures, the Supreme Court ordered the federal suit dismissed.

In this case, New York state has a comprehensive statutory scheme and settled administrative procedures for dealing with environmental and safety violations threatening pollution of New York's waterways and beaches. We take judicial notice of the huge amount of oil and oil-related products transported in and near New York's shore lines by vessels, pipeline and vehicles. Many oil spills occur each year in the port of New York. They threaten the safety and welfare of the state's population. Closing of New York's beaches because of pollution poses risks to the health and well-being of millions of people and could prove a disaster to the state's tourist industry. Fire resulting from petroleum spills and the interruption of shipping with adverse effects on commerce, jobs and tax revenues are properly of great concern to New York state.

Deciding the state statutory and regulatory issues in this case may disrupt state efforts to create a viable statutory and administrative scheme for coping with pollution of New York's waterways. Under *Burford,* dismissal is mandated as a matter of law and in the exercise of the court's discretion. *See, e.g., Onondaga Landfill Sys., Inc. v. Williams,* 624 F.Supp. 25 (N.D.N.Y.1984) (abstention applied in case challenging constitutionality of New York Environmental Conservation Law provisions granting DEC Commissioner broad inspection powers).

### 2. *Pullman*

Abstention under *Pullman* is proper where a state proceeding can be brought with reasonable promptness, and a decision on an unsettled question of state law may moot the federal case. Once a court has abstained, the plaintiff must generally file a state court action and expose the federal constitutional issue so that the state court may "interpret the statute in light of the

constitutional objections presented." *Government & Civic Employees Org. Comm. v. Windsor,* 353 U.S. 364, 366, 77 S.Ct. 838, 839, 1 L.Ed.2d 894 (1957).

■ Plaintiffs' complaint raises serious questions about New York's laws. On its face, section 71–0301 offers little guidance on when the Commissioner may act, and apparently offers none as to when and how Summary Abatement Orders are terminated. Moreover, the licensing provisions of New York's Navigation Law, while empowering the Commissioner to impose fines, do not appear to explicitly authorize the Commissioner to revoke licenses as implicitly claimed in 17 NYCRR § 30.10(b). It is precisely because these are unresolved and difficult questions of state law that abstention is appropriate. The state courts have not had occasion to provide an authoritative interpretation of these statutes. If a state court were to decide that the Commissioner exceeded his statutory power, the plaintiffs' licenses would be reinstated and the federal constitutional questions avoided. *Accord Brookhaven Aggregates, Inc. v. Williams,* 23 E.R.C. 1927, 1985 WL 6062 (E.D.N.Y.), *aff'd,* 795 F.2d 78 (2d Cir.1985) (motion to enjoin Summary Abatement Order denied on grounds of abstention).

## D.  PREEMPTION

■ State laws must give way to conflicting federal laws or regulations under the supremacy clause. *See generally Wisconsin Pub. Intervenor v. Mortier,* — U.S. —, 111 S.Ct. 2476, 2481–83, 115 L.Ed.2d 532 (1991). Preemption will be found if compliance with both state and federal law is impossible. *See, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). It may also be inferred where state law inhibits conduct that federal law specifically encourages. *See, e.g., Nash v. Florida Indus. Comm'n,* 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967). Preemption will also occur even in the absence of any conflict between state and federal provisions if there is evidence that Congress has completely "occupied the field" in which the

state seeks to regulate. *See, e.g., Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Plaintiffs have not established that Article 12 of New York's Navigation Law is preempted on any of these theories. Plaintiffs' contention that New York's summary abatement statute ought to be voided as preempted is also meritless.

■ Plaintiffs contend that the licensing provisions of New York Navigation Law, insofar as they provide for the safe operation of seagoing vessels, are preempted by the Ports and Waterways Safety Act of 1972 (PWSA), as amended, *see* 33 U.S.C. §§ 1221–32, and by Subtitle II of Title 46 of the United States Code (governing shipping). *See* 46 U.S.C. §§ 2101–14702. 33 U.S.C. § 1223 authorizes the Secretary of Transportation to establish rules and regulations to ensure the safe operation of vessels in port waters. Existing regulations affecting oil tankers include 33 C.F.R. § 161 (establishing vessel traffic rules for various United States ports); 33 C.F.R. § 160 (empowering Coast Guard officers to ensure safety of vessels and port waters); and 33 C.F.R. § 157 (establishing design and operation regulations for oil tankers). Federal regulations promulgated under the PWSA also specifically grant the United States Coast Guard authority to prohibit vessels from operating in United States waters if the vessels' operational records suggest that they pose an environmental threat. *See* 33 C.F.R. § 160.113. 46 U.S.C. § 3703(a) requires the Secretary of Transportation to prescribe regulations for the design, construction, maintenance, and operation of certain tanker vessels. *See* 46 C.F.R. § 30.01–30.30. Further regulations specific to oil tankers are found in 46 U.S.C. § 3703a.

There is no conflict between these federal statutes and the applicable state law. The only relevant substantive standards (i.e., standards governing the actual operation of oil-carrying vessels) in Article 12 of New York Navigation Law are contained in section 174, which sets as a condition precedent to the issuance of an operating license that the licensee comply with state and

federal plans for control of petroleum discharges and that the licensee provide necessary equipment to prevent, contain and remove discharges of petroleum. New York Navigation Law § 174(3) and (8). (Regulations of "new vessels" sold in New York requiring "fuel oil tank vents" do not become effective until 1994 and are not implicated in the current suit. *See* New York Navigation Law § 173(2).) Plaintiffs do not maintain that these conditions conflict with, or inhibit the implementation of, federal law. In fact they admit that the New York regulations are for the most part merely duplicative of their federal counterparts. *Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss,* at 6–7. Plaintiffs thus concede that "[t]he issue of federal preemption of New York State regulation in this area is practically moot because ... there is little state regulation." *Id.* at 6.

Since there is no direct conflict between state and federal law, plaintiffs must rely on a claim that New York law discourages behavior whose promotion is the aim of federal law or that Congress has occupied the field of oil pollution control. Plaintiffs maintain that *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), is conclusively in its favor on these points. Contrary to plaintiffs' view, *Ray* indicates how far the Supreme Court is willing to go to allow local regulation of oil tanker activity. *See* L. Tribe, *American Constitutional Law* § 6–26, at 487 (2d ed. 1988) ("[T]he basic teaching of the [*Ray*] decision is that state pressure to act in derogation of a federal statutory scheme is not to be inferred lightly.").

*Ray* concerned an attempt by the State of Washington to impose restrictions on oil tankers operating in Puget Sound. The Washington statute contained three provisions. The first required tankers "enrolled in the coastwise trade" to have on board a pilot licensed by Washington state; the second established that vessels entering Puget Sound were required either to meet specific design criteria or be escorted into port by tugboats; the third provision excluded from Puget Sound any tanker in excess of certain tonnage.

The Supreme Court held that the third provision of the state statute was preempted because it directly conflicted with vessel size regulations enacted by the Secretary of Transportation pursuant to the PWSA. *Ray,* 435 U.S. at 173–75, 98 S.Ct. at 1002–03. Likewise, the Court found that the first provision of the Washington law requiring a local pilot for vessels engaged in coastwise trade was, if read literally, preempted because it conflicted with PWSA provisions governing the licensing of pilots. Nevertheless, the Court indicated that this holding was necessary only because of the overly broad language of the state statute. Insofar as the statute required local pilots for vessels only when operating in the confines of Puget Sound, the Court found no preemption. Accordingly, it reversed a lower court ruling voiding the state provision in its entirety. *Id.* at 159–60, 98 S.Ct. at 995.

The Court also stretched to avoid preemption in ruling on the second provision (providing the option of meeting certain design requirements or using a tugboat escort). The design requirements were ruled preempted by regulations issued pursuant to PWSA provisions authorizing the Secretary of Transportation to establish "comprehensive minimum standards of design, construction, alteration, repair, maintenance, and operation," as well as a system of inspection to ensure compliance with these standards. *See id.* at 161, 98 S.Ct. at 996. The Court nevertheless held that the second provision was saved by the fact that these preempted requirements were posed as an alternative to the tugboat escort. Since the latter provision was not preempted, the statute was deemed enforceable to the extent it imposed only the tugboat escort requirement. *Id.* at 172–73, 98 S.Ct. at 1002.

Plaintiffs claim that the licensing provisions of Article 12 of the New York Navigation Law are akin to the design, construction and operation requirements and the tonnage limitations invalidated in *Ray.* *Ray,* however, only invalidated state provisions where there was an actual conflict between state and federal law. Where

there was no such conflict, the Court steadfastly refused to infer preemption in the field of environmental protection, an area that lies at the core of the states' police powers. *See Ray*, 435 U.S. at 157, 98 S.Ct. at 994 ("[W]hen a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The *Ray* Court thus emphasized:

> We do not question in the slightest the prior cases holding that enrolled and registered vessels must conform to "reasonable, nondiscriminatory conservation and environmental protection measures ..." imposed by a State.

*Id.* 435 U.S. at 164, 98 S.Ct. at 997 (quoting *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 277, 97 S.Ct. 1740, 1747, 52 L.Ed.2d 304 (1977)).

The New York licensing provisions present an even weaker case for preemption than did the provisions upheld in *Ray*. As plaintiffs themselves emphasized at oral argument, section 174's licensing scheme effectively places a tax on vessels seeking to operate in New York waters to finance oil spill cleanups. There is no evidence that such a tax discourages navigation that Congress sought to promote. Particular classes of vessels are not barred from New York harbors. The scheme does not appear to require any design or operational modifications beyond those set by federal law. The licensing scheme is not discriminatory against non-New Yorkers. *Long Island Oil Terminals Ass'n v. Commissioner*, 70 A.D.2d 303, 306, 421 N.Y.S.2d 405, 407 (App.Div. 3d Dep't 1979). For all these reasons, a finding of preemption is unwarranted.

If there were any doubt as to congressional design, provisions in the Federal Water Pollution Control Act (the Clean Water Act), 33 U.S.C. §§ 1251–1387, as amended by the Oil Pollution Control Act of 1990 (OPCA), 33 U.S.C. §§ 2701–61, settle the issue. The original Clean Water Act specifically establishes a system of liability for the release of oil into waters that is almost identical to the provisions of Article 12. *See* 33 U.S.C. § 1321. Vessel owners and operators are subject to imprisonment, fines, and civil liability for illegal discharges of oil. *Id.* § 1321(b). Section 1321(s) also allows use of the "Oil Spill Liability Trust Fund" created under the Internal Revenue Code to compensate government for cleanup costs. The Fund is financed in part from fines assessed under section 1321(b). Although section 1321 was recently modified by the passage of the OPCA, vessel owners and operators are still liable for unpermitted discharges of oil and the Fund continues to operate much as it did before. *See* 33 U.S.C. §§ 2701(32), 2702.

If Congressional plans to preempt statutes like Article 12 were to be found anywhere, it would be in these two statutes. Yet both the Clean Water Act and OPCA explicitly state the opposite. 33 U.S.C. § 1321(*o*)(2) reads:

> Nothing in this section shall be construed as preempting any State ... from imposing any requirement or liability with respect to the discharge of oil ... into any waters within such State, or with respect to any removal activities related to such discharge.

33 U.S.C. § 2718(a)(1) provides that OPCA shall not

> affect, or be construed or interpreted as preempting, the authority of any State ... from imposing any additional liability or requirements with respect to (A) the discharge of oil or other pollution by oil within such State; or (B) any removal activities in connection with such a discharge....

Far from being preempted, Title 12 of New York's Navigation Law accepts the federal government's invitation to provide additional means of enforcing the federal policy favoring clean water.

Practical considerations also favor upholding the state statutes against a claim of preemption. Plaintiffs in effect are asking the federal courts to tell New York that it may not, in the exercise of its police

powers, plan against the desecration of its waters and coasts that would otherwise surely result from the high volume of oil barge traffic on the state's waterways. Plaintiffs would instead have the state rely entirely on distant and overextended officials in Washington, D.C. for basic environmental protections. Such an ineffective scheme is not contemplated by the federal Constitution.

If there is any potential problem with the tax imposed by Article 12 it is the burden such a tax places on interstate commerce. Yet there is no evidence indicating that the burden is unreasonable or that it exceeds the cost of policing and protecting against adverse consequences of oil transportation on New York's waterways. The *Ray* Court indicated that commerce clause challenges to environmental protection statutes should not be entertained lightly. *See Ray*, 435 U.S. at 179–80, 98 S.Ct. at 1005.

Plaintiffs also argue that the Summary Abatement provisions of New York Environmental Conservation Law section 71–0301 are preempted by the PWSA. This contention appears to be moot. It is not clear from the record or the text of section 71–0301 or the regulations promulgated pursuant to that provision in 6 NYCRR § 620 at what point a Summary Abatement Order ceases to have effect. Since full hearings on the validity of the initial order have been afforded as required by law, however, the only live issue seems to be the revocation of licenses under New York Navigation law.

■ In any event, *Ray* specifically allowed for statutes that are designed to protect the environment against imminent (or even non-imminent) harms. There is no showing of a conflict or overlap between sections 71–0301 and the PWSA because the former does not establish criteria regulating the construction and operation of vessels. As pointed out above, there is no evidence of a federal program completely occupying this field.

Plaintiffs press other objections to section 71–0301. They contend that the statute is void because it delegates the power to issue Summary Abatement Orders without specifying any objective controlling criteria. Alternatively, they maintain that the hearing they obtained was inadequate because it excluded exculpatory evidence and admitted unreliable evidence.

No doubt there is considerable potential for abuse in a statute that grants an agency official as much power and discretion as does section 71–0301. The burden placed on plaintiffs by having their operations shut down has been severe. But the extent to which these burdens are the result of defective application of state laws and procedures is a question that can be and ought to be pursued in the state courts. No federal constitutional violation has been shown.

### III.   CONCLUSION

The case is dismissed. No costs or disbursements are assessed. Plaintiffs' claims were made in good faith. All parties and the court were operating in the murk of complex statutory and regulatory provisions. Plaintiffs have been prevented from operating their valuable oil transportation business for almost two years. They should not be further penalized by court-imposed costs.

So ordered.