MERRELL DOW PHARMACEUTICALS INC., Appellant,

v.

Mary Virginia OXENDINE, Appellee.

No. 92–CV–1129.

District of Columbia Court of Appeals.

Argued March 17, 1994.

Decided Nov. 9, 1994.

Walter A. Smith, Jr., with whom Stephen G. Vaskov and Jonathan S. Franklin, Washington, DC, were on the brief, for appellant.

Barry J. Nace, with whom Irving R.M. Panzer, Washington, DC, was on the brief, for appellee.

Before STEADMAN, SCHWELB and SULLIVAN, Associate Judges.

STEADMAN, Associate Judge:

The fourth appeal in this extended litigation raises two issues: first, whether the trial court properly ruled that neither the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–393 (1988 & Supp. V 1994), nor approval of Bendectin by the Food and Drug Administration ("FDA") preempts state[1] tort law; and second, whether the trial court properly refused to reconsider the jury verdict in the light of post-trial developments. We hold that the trial court correctly decided the preemption issue and correctly determined that Merrell Dow must meet a rigorous standard in order to reopen the

---

1. For purposes of the FDCA and preemption analysis, the law of the District of Columbia is analogous to that of a state. *See* 21 U.S.C. § 321(a)(1).

issue of causation, but erred in flatly refusing to consider any of the proffered post-trial developments. Accordingly, we are reluctantly compelled to remand for further limited consideration.

## I.

In this product liability case, plaintiff-appellee Mary Oxendine alleges that her mother's ingestion during pregnancy of Bendectin, a prescription drug manufactured by defendant-appellant Merrell Dow Pharmaceuticals, Inc. ("Merrell Dow"), caused her birth defects. In May of 1983, a jury awarded Oxendine $750,000 in compensatory damages. The trial court granted Merrell Dow's motion for judgment notwithstanding the verdict and alternatively a new trial, and Oxendine appealed. This court reversed and remanded with instructions to reinstate the jury verdict and conduct further proceedings on punitive damages. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (D.C.1986) (*Oxendine I*). On remand, the trial court granted Merrell Dow's motion, filed under Rule 60(b), vacating the jury verdict and granting a new trial based on perceived failings in Oxendine's expert witness. Oxendine again appealed and this court reversed and remanded with instructions to reinstate the jury verdict. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 563 A.2d 330 (D.C. 1989) (*Oxendine II*), cert. denied, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990). The trial court entered final judgment in favor of Oxendine on compensatory damages, but postponed the trial on punitive damages. Merrell Dow appealed and this court dismissed the appeal for want of a final judgment with instructions to vacate the judgment entered under Rule 54(b). *Merrell Dow Pharmaceuticals, Inc. v. Oxendine*, 593 A.2d 1023 (D.C.1991) (*Oxendine III*).

While *Oxendine III* was pending on appeal, Merrell Dow moved the trial court for permission to brief the issues of punitive damages and federal preemption of state tort law. The trial court ordered the parties to brief the issues of preemption and punitive damages and granted Merrell Dow permission to file a Rule 60(b) motion challenging the validity of the jury verdict in light of post-trial information. The briefs were filed and on September 6, 1991, Merrell Dow moved for relief from the verdict or, in the alternative, a new trial based on post–1983 developments. Oxendine filed a praecipe seeking dismissal of her punitive damages claim and a motion for entry of final judgment on compensatory damages. Merrell Dow's response opposed final judgment until all other pending issues were resolved, including preemption and the September motion. On June 9, 1992, the trial court granted Oxendine's motion for entry of judgment, but did not order the punitive damages claim dismissed or rule on Merrell Dow's outstanding motions. On June 18, 1992, judgment was docketed in favor of Oxendine on compensatory damages. Merrell Dow filed a motion to clarify and amend the judgment or, alternatively, to reconsider and stay execution of judgment. On September 3, 1992, the court dismissed Oxendine's punitive damages claim, ruled against Merrell Dow on the issues of preemption and reconsideration in light of post-trial developments, and ordered entry of final judgment in Oxendine's favor. On September 4, 1992, judgment was again entered in favor of Oxendine. Merrell Dow appeals the trial court's rulings that the FDCA does not preempt state tort law and that the verdict would not be reconsidered in light of post–1983 developments.

## II.

Merrell Dow first argues that the trial court incorrectly ruled that the tort claim in this case was not preempted by the FDCA.[2] Preemption arises from the Supremacy Clause, which provides:

---

**2.** The federal preemption argument was first specifically raised on June 13, 1991, after the second appeal and eight years after the jury verdict, when Merrell Dow requested the trial court to allow briefing on the issue. Although Oxendine did not oppose the motion to permit briefing on this issue, it did argue in its brief to the trial court that the issue had been untimely raised. The trial court did not resolve the timeliness issue, but instead ruled on the merits. The trial court would have been well within its rights to deny the motion on timeliness and may even have had an obligation to dismiss it on that ground; the issue could have been raised at the

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2. Preemption of state law may occur in three ways. First, a federal law may expressly preempt state law. *Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2522–23, 81 L.Ed.2d 399 (1984). Second, Congress may "so thoroughly occup[y] a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Third, preemption results if a state law directly conflicts with a federal law in one of two ways: compliance with both federal and state law is impossible; or state law obstructs the federal purpose.[3] *Michigan Canners, supra,* 467 U.S. at 469, 104 S.Ct. at 2522–23. Where the state laws at issue affect health and safety issues, there is a presumption against implied preemption by congressional enactments. *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). Finally, preemption is less likely if the federal law leaves a plaintiff without any available legal means of redress. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104

S.Ct. 615, 623, 78 L.Ed.2d 443 (1984); *Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1112 (4th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

■ The essential failing of Merrell Dow's claim of preemption is Merrell Dow's insistence that Congress intended the FDCA to be more than a minimum standard of drug safety and that the FDA likewise intended its approval of Bendectin to be a standard which the jury could not override by effectively forcing the drug off the domestic market. From this basis, Merrell Dow argues that state action here did not simply supplement but rather completely overrode FDA standards, with the practical effect of creating an obstacle or direct conflict with the FDA's approval of Bendectin.

Merrell Dow's argument, however, is negated by the numerous cases which have specifically ruled that the FDA prescription drug regulations and safety determinations are intended to be minimum standards which "do not conflict with state law which sets higher standards for due care and safety in the manufacture of drugs." *Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142, 1152 (D.Or. 1989); *see, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 658 (1st Cir.1981); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359, 1362 (4th Cir.1975); *Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293, 1299 (D.Minn.1988); *Spychala v. G.D. Searle & Co.,* 705 F.Supp. 1024, 1030 (D.N.J.1988); *Stromsodt v. Parke–Davis & Co.,* 257 F.Supp. 991, 997 (D.N.D.1966), *aff'd,* 411 F.2d 1390 (8th Cir.1969).[4]

---

very outset of the litigation and, if determined in Merrell Dow's favor, would have been determinative and obviated the need for any trial. However, we do not rule on that issue because the trial court opted to go to the merits and we think its substantive ruling was correct.

3. "Obstacle" preemption is the only theory upon which Merrell Dow relied before the trial court. On appeal, Merrell Dow also claims that Congress expressly preempted state law by the language in the 1962 Amendments to the FDCA which states that "[n]othing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law ... unless there is a direct and positive conflict between such amendments and such provision of State law." Pub.L.

No. 87–781, § 202, 76 Stat. 780, 793 (1962), 21 U.S.C. § 321 note (1988). Merrell Dow argues that the jury verdict in this case directly conflicts with the FDCA, a conclusion with which we disagree as hereafter indicated. We also observe that debates on the adoption of this provision expressly noted that the provision was consistent with the intention that federal law should not preempt in those fields where state food and drug laws are stronger. 108 CONG REC. 21,083 (1962).

4. We find Merrell Dow's attempts to distinguish some of these cases unpersuasive. Merrell Dow argues that in *Salmon* and *Kociemba* the FDA preferred more extensive warning and testing than was actually required and in *Brochu* a substitute drug was available, thus jury verdicts in

In *Silkwood, supra,* the Supreme Court determined that the Atomic Energy Act of 1954 did not preempt all state tort action against manufacturers of plutonium products for personal injuries. The Court said:

> No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability.... Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

*Silkwood, supra,* 464 U.S. at 256, 104 S.Ct. at 625. The Supreme Court's reasoning in *Silkwood* has been found "equally compelling in the context of the FDCA." *Kociemba, supra,* 680 F.Supp. at 1299. In ruling that the FDCA did not preempt state tort law actions against manufacturers of prescription drugs, the court in *Kociemba* found that "[i]f Congress wants to take the extraordinary step of giving drug manufacturers immunity from personal tort actions, it would expressly state such intentions whether by statute or legislative history," *Kociemba, supra,* 680 F.Supp. at 1299–1300 (citing *Silkwood, supra,* 464 U.S. at 251, 104 S.Ct. at 622–23), as Congress

did for medical devices.[5] *Spychala, supra,* 705 F.Supp. at 1029. One court further noted that "state tort law may have some regulatory effect on federal laws and regulations, however, such effect does not conflict in such a manner that compliance with both federal and state law is impossible." *Kociemba, supra,* 680 F.Supp. at 1300. We agree with this reasoning and find that federal law does not preempt the local tort law claims here.

■ Merrell Dow also argues that because the FDA found Bendectin to be safe and the jury found it to be unsafe, the FDA and jury findings are irreconcilable and resolution of the conflict requires federal preemption. However, an FDA finding that a drug is "safe and effective" is a term of art, not a legal conclusion for state tort law purposes. *Kociemba v. G.D. Searle & Co.,* 707 F.Supp. 1517, 1525–26 (D.Minn.1989). FDA approval is not determinative of preemption, but is instead one factor for the jury to consider in reaching a verdict. *Tobin v. Astra Pharmaceutical Products, Inc.,* 993 F.2d 528, 537–38 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993). Courts have overwhelmingly found no general preemption of all state tort claims. *Hurley v. Lederle Lab. Div. of Am. Cyanamid Co.,* 863 F.2d 1173, 1176 (5th Cir.1988) (and see cases cited therein).[6] Hence, the FDA action with respect to Bendectin was not intended to resolve the issue of safety for all purposes, and its finding of safety does not irreconcilably conflict with the jury's finding of liability with respect to Merrell Dow.[7]

those cases that the drug in question was unsafe and should not be distributed would not conflict with the FDA safety determination. However, for purposes of determining whether the FDA regulations are preemptive, the issue before the court is properly whether the FDA regulations and determination of safety as such preempt state tort law claims relating to use of a drug.

5. This is one of several factors upon which the trial judge relied in finding no federal preemption under the "obstacle" analysis. Merrell Dow mischaracterizes the judge's reasoning by suggesting that the court determined that preemption could only occur with an express statement of congressional intent.

6. Where preemption has been found it is limited to areas such as warning labels where the FDA completely controls all warning language such that the manufacturer could not comply with any

additional state label requirements, and even in those situations preemption will only apply if the manufacturer provided the FDA with all necessary and available information on which to base the warning. *See Hurley, supra,* 863 F.2d at 1179–80. Liability in this case focussed on whether Bendectin caused appellee's birth defects, *Oxendine I, supra,* 506 A.2d at 1110, not on the adequacy of the warnings.

In addition, Bendectin has been the subject of litigation across the country, and thus far, no court has found federal preemption of local tort claims.

7. Following this reasoning, Merrell Dow's assertion that the "prevalence of such lawsuits in the Bendectin context" caused withdrawal of the drug from the national market likewise does not create an irreconcilable conflict with the function of the FDA.

## III.

■ Merrell Dow also contends that the trial judge erred in flatly refusing to consider post–1983 evidence regarding Bendectin's safety.[8] The trial court determined that the new circumstances upon which Merrell Dow relied did not meet what it deemed the Rule 60(b)(2) standard of "pertain[ing] to facts in existence at the time of the trial, and not to facts that have occurred subsequently." 6A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 59.08[3], at 59–101 (2d ed. 1994). *See* 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §§ 2808, 2859 (1973); *National Anti–Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control,* 229 U.S.App.D.C. 143, 147 n. 3, 711 F.2d 1071, 1075 n. 3 (1983). The trial court reasoned that the real developments were the studies published after May 1983 rather than the data upon which the studies were based. It did not matter that the data existed at the time of trial because the conclusions of the new studies were developed after trial. Hence, Merrell Dow's new evidence

pertained to facts that occurred subsequently and the court denied Merrell Dow's motion.[9]

Although we entirely agree with the trial court's general approach of exercising great caution in considering new evidence as here, we think the trial court went just a step too far in this analysis of the nature of the proffered newly discovered evidence in the context of an issue of scientific fact. The basic scientific fact at issue in this litigation is whether Bendectin possesses teratogenic qualities; that is, whether it can be a cause of birth defects. At least some of the proffered evidence, although in the form of studies published, or even conducted, after the time of trial, were not independent subsequent facts as such but rather further investigation into and evidence relating to the ongoing and yet at bottom timeless scientific question of Bendectin's teratogenic qualities.

This state of affairs is inherent in scientific inquiry. The very nature of science incorporates a view of even generally accepted explanations of phenomena as tentative truths, not settled certainties. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, —, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).[10] Scientific inquiry contemplates con-

---

8. In the reply to Oxendine's opposition to the motion for relief from the verdict, Merrell Dow identified four "significant factual developments" in support of the motion:

(1) trend data demonstrating that since June 1983 when Merrell Dow stopped manufacturing Bendectin—which had been used extensively by pregnant women in the U.S.—there has been *no* change in the incidence of birth defects;

(2) the publication of several major, peer-reviewed epidemiological studies between December 1983 and January 1991 that add significantly to the total number of women and pregnancies that have been studied in connection with Bendectin and that unanimously conclude that Bendectin does not cause birth defects;

(3) the conclusions of several "meta-analyses" that have pooled the substantial body of data from the numerous individual studies of Bendectin and have concluded that Bendectin does not cause birth defects; and

(4) the actions of two governmental bodies— the Canadian Ministry of Health and Welfare in 1989 and the FDA in 1987—which, respectively, adopted a special advisory panel's recommendation that there is *no* evidence Bendectin causes birth defects, and concluded that doxylamine succinate (the ingredient plaintiff's expert claims to be teratogenic) is *not* a teratogen.

(emphasis in original).

9. The trial court also determined that *Oxendine I* and *Oxendine II* prevented consideration of any new evidence such as that proffered by Merrell Dow. It is indubitably correct that these prior decisions reinstating the jury verdict form an important background to the motion under review and constitute a formidable obstacle to be overcome. However, the decisions did not outright bar any consideration of a motion such as that made to the trial court here.

10. Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. See, *e.g.,* Brief for Nicolaas Bloembergen et al. as *Amici Curiae* 9 ("Indeed, scientists do not assert that they know what is immutably 'true'—they are committed to searching for new, temporary theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science and the National Academy of Sciences as *Amici Curiae* 7–8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement") (emphasis in original).
*Daubert, supra,* — U.S. at ——, 113 S.Ct. at 2795.

tinuing investigation, development, testing and reevaluation even of what has been regarded and accepted as scientific reality. *See* Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test,* 78 MINN.L.REV. 1345, 1382–86 (1994) (discussing pressures caused by developing scientific knowledge in mass tort litigation). *See generally* THOMAS S. KUHN, THE STRUCTURE OF SCIENTIFIC REVOLUTIONS (2d ed. 1970). Thus, scientific evidence arises in a somewhat different context than normal "newly discovered evidence."

■ The question, then, is how courts should deal with subsequent scientific inquiry and developments which cast doubt upon the correctness of a jury's conclusion with respect to a scientific fact. While the trial court erred in its refusal to consider the proffered evidence at all, we think it rightly adopted a tightly limited receptiveness to Merrell Dow's motion in the circumstances here, reflecting an essential difference between science and the law. The requirements and realities of the courtroom are not those of the laboratory. *See Ferebee v. Chevron Chemical Co.,* 237 U.S.App.D.C. 164, 170–71, 736 F.2d 1529, 1535–36 (allowing recovery without scientific certainty), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Although science is a constantly evolving process, the law depends upon a high level of certainty once an outcome has been determined. A trial can be no more than a resolution of an immediate dispute on the basis of present knowledge; its outcome must turn upon the teachings of science as understood at the time of trial as best can be discerned through the presentations of the parties. Where scientific facts are at issue, it is not unexpected, given the nature of the process, that the passage of time will bring forth further scientific data and inquiry relating to the ultimate scientific fact at issue. To reopen the trial's determination of scientific truth, however, runs squarely into the fundamental principle of certainty.[11]

We recently had occasion to examine and reassert this principle in *Clement v. District of Columbia Dep't of Human Servs.,* 629 A.2d 1215 (D.C.1993) (trial court without basis in law to reopen case after final judgment in circumstances presented). "A fundamental principle of litigation that has been stressed in a variety of contexts is the importance of finality." *Id.* at 1218. Consistent with this approach, courts have generally held that part of the criteria for the grant of a motion on the basis of newly-discovered evidence[12] is that the evidence "is material and controlling and clearly would have produced a different result if presented before the original judgment," *Brown v. Petrolite Corp.,* 965 F.2d 38, 50 (5th Cir.1992) (Rule 60(b)(2) test), or at least is material and would probably produce a new result at a new trial. *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878 (9th Cir.1990) (applying Rule 60(b)(2) test of whether new evidence is

**11.** "Yet there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly." *Daubert, supra,* —— U.S. at ——, 113 S.Ct. at 2798.

**12.** Although Merrell Dow sought and was granted permission to file its motion as one under Rule 60(b), the parties dispute whether it should be considered to have been made under Super.Ct.Civ.R. 54(b), 59, or 60(b). We think that in the circumstances here, no significant difference should result. Within any of these rules, the passage of time will be an element that should be factored into the discretionary decision. This case is unusual in that it has already involved prior motions for a judgment notwithstanding the verdict and a new trial, including one under Rule 60(b), subjected to appellate court review. Given the posture of the case, however it may have come about, principles of finality seem to us to dictate the application of discretionary analysis within the standards of Rule 60(b)(2), even if technically the discretion thus exercised were to derive from Rule 54(b). It is generally held that criteria for relief are essentially the same for Rule 59 motions as for Rule 60. *Boryan v. United States,* 884 F.2d 767, 771 (4th Cir.1989) (citing *United States Fidelity & Guaranty Co. v. Lawrenson,* 334 F.2d 464, 465 n. 2 (4th Cir.), *cert. denied,* 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964)); 6A JAMES W. MOORE ET AL, MOORE'S FEDERAL PRACTICE ¶ 59.08 3 n. 5 (2d ed. 1994); 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE ¶ 2808 (1973). We need not consider any differences in standard between Rule 60(b)(2) and 60(b)(6), since the motion here is clearly timely within the one-year limitation of the former.

"likely to change the disposition of the case" to Rule 59 motion); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 515 (8th Cir.) (Rule 60(b)(2) test of whether new evidence "probably would produce a new verdict"), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Philip v. Mayer, Rothkopf Indus., Inc.,* 635 F.2d 1056, 1063 (2d Cir.1980) (affirming denial of Rule 59 motion in part because evidence could not change result); *United States v. Walus,* 616 F.2d 283, 287–88 (7th Cir.1980) (Rule 60(b)(2) test of whether new evidence "would probably produce a new result"); 6A MOORE ET AL., *supra* note 12, at ¶ 59.08[3]. In this jurisdiction in particular, as set forth in the seminal case on the point, Merrell Dow must demonstrate that the newly discovered evidence "would probably produce a different verdict if a new trial were granted." *Imhoff v. Walker,* 51 A.2d 309, 312 (D.C.1947). *See also Forgotson v. Shea,* 491 A.2d 523, 528 (D.C.1985) (evidence "would likely produce a different result at a new trial"); *Mahallati v. Williams,* 479 A.2d 300, 305 (D.C.1984) (affirming denial of motion where new testimony "would probably not have produced a different result at a new trial"); *Frost v. Hays,* 146 A.2d 907, 909 (D.C.1958) (requiring that evidence "would likely produce a different result at a new trial"); *Bradley v. Prince,* 105 A.2d 253, 254–55 (D.C.1954) (requiring that evidence "would probably produce a different verdict if a new trial were granted").[13] This strict standard seems a particularly sound requirement in the context of a factual dispute turning on scientific evidence, as here. It is far too little for the movant simply to proffer new developments which might tip the preponderance of evidence the other way. Rather, later scientific inquiry must establish that in probability the

scientific fact on which the verdict relies is wrong.[14] Given the nature of the scientific process and its continuing development of data and on-going examination of scientific truth, decisions in trials turning on scientific factual determinations would be at constant risk if a lesser standard were used. The ends of the litigation process would be subverted if, as Merrell Dow seems to suggest, a jury's determination of a scientific fact after a full trial, twice affirmed by an appellate court, could be the subject of potentially endless re-examination except in the most unusual of circumstances.[15]

▪ A trial court decision on whether to grant or deny a motion for relief is reviewed for abuse of discretion. *Gause v. C.T. Management, Inc.,* 637 A.2d 434, 437 n. 3 (D.C. 1994) (abuse of discretion standard for Rule 60(b)); *Fleming v. District of Columbia,* 633 A.2d 846, 849 (D.C.1993) (same); *Foretich v. CBS, Inc.,* 619 A.2d 48, 63–64 (D.C.1993) (applying abuse of discretion standard to Rule 59(e) motion); *State Farm Mut. Auto. Ins. Co. v. Brown,* 593 A.2d 184, 185 (D.C. 1991) (abuse of discretion standard for Rule 60(b) motion); 6A MOORE ET AL., *supra* note 12, at ¶ 59.08[3] (abuse of discretion standard for Rule 59). Accordingly, since for the reasons stated the trial court erred in refusing to consider at all the proffered new evidence, we remand the case to the trial court for further proceedings. Not only is that court in a better position than we to evaluate in detail the proffered evidence, it is that court that is empowered to make the discretionary decision in ruling on the motion, subject only to review for abuse. *See Stridiron v. Stridiron,* 698 F.2d 204, 208 (3d Cir.1983) (remanding for a hearing where trial court's consideration of new evidence was incomplete).[16]

---

13. We see no distinction between the use of the words "likely" and "probably," the cases citing each other interchangeably.

14. Disputes over scientific facts, once submitted for jury consideration, will typically turn upon the "classic battle of experts," as *Oxendine I* characterized the trial here. 506 A.2d at 1110. In such circumstances, we think that the trial court would properly take the position that a different result would probably ensue only on a showing that all responsible scientific thought

has clearly gelled into a general consensus contrary to the view prevailing at trial.

15. Among other considerations underlying the finality principle is a concern that the outcome of litigation will ultimately be determined simply on the basis of which party has the financial resources to force a near-perpetual elongation.

16. By no means is Merrell Dow entitled to another full evidentiary hearing on the issue of Bendectin's alleged teratogenic quality. The trial court may judge the new evidence on the basis of

The order from which Merrell Dow appeals is vacated and the case remanded for further proceedings in accordance with this opinion.

*So ordered.*

SCHWELB, Associate Judge, concurring:

I join without reservation Judge Steadman's lucid opinion for the court. I write separately, however, to address some of the practical implications of the positions taken by Merrell Dow in this appeal.

## I.

In a case like this one in particular, I think it appropriate to stress that the decisions which we are asked to make are not solutions to algebraic problems. Rather, they affect real people. Mary Virginia Oxendine was born on January 25, 1971 with a shortened right forearm and with only three fingers on her right hand. In her complaint, filed on February 1, 1982, she alleged that her mother used Bendectin during her pregnancy, and that Bendectin caused Ms. Oxendine's birth defects. Following a protracted trial in May 1983, the jury credited her allegations and awarded her substantial damages. In *Oxendine I* and again in *Oxendine II*,[1] this court sustained the judgment.

Ms. Oxendine will soon be twenty-four years old. This suit was filed almost thirteen years ago. More than eleven years have elapsed since the trial. Now, four appeals later, Ms. Oxendine has yet to receive a penny from Merrell Dow. Although our decision in this case probably brings us somewhat closer to the day on which Ms. Oxendine will actually receive some compensation,

we cannot say with assurance, even today, that the end of the long journey is imminent.

Justice delayed is justice denied. Ms. Oxendine's childhood is over. Timely receipt of the money might perhaps have made it easier for her to deal with the consequences of her handicap during her teen-age years. Unfortunately, that opportunity has been lost forever.

In resolving the specific issues presented to us in this appeal, we should keep in mind the "big picture," and must not allow ourselves to miss the forest for the trees. Any rational observer from another land or planet who looked at this case without our somewhat parochial lawyers' perceptions would, I think, conclude that, in this instance, our adversarial system has not been an unqualified success. I am not suggesting that any one participant in the process is to blame. I do not attribute past delays particularly to Merrell Dow. Two of the prior appeals were by counsel for Ms. Oxendine. Moreover, this is the fourth time that the case has reached this court, and we have yet to affirm a trial court judgment.

It is better to light a candle than to curse the darkness. Unfortunately, I have no ready recipe to speed up the process, except to suggest that we may have something to learn from the civil law system which is widely practiced outside the English-speaking world, and which disposes of these disputes more promptly.[2] But whether or not we can find ways to alleviate the problem of protracted litigation for the generality of cases, the inordinate delay in this instance must surely be taken into consideration in

the proffer made by Merrell Dow, with whatever further inquiry the trial court may wish to provide, in light of the standard set forth above which, in the interest of finality, requires the probability that a different verdict would result from a new trial. Further, any review of the trial court's exercise of discretion will be deferential, for it is "most exceptional for an appellate court to interfere with the discretion exercised by the trial court in determining ... whether the newly discovered evidence, if admitted, would likely cause a different result." *Harris v. Whiteman,* 243 F.2d 563, 565 (5th Cir.1957), *rev'd on other grounds,* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958) (per curiam).

1. The citations to these earlier *Oxendine* decisions appear in Judge Steadman's opinion for the court.

2. Whether it is the innate excellence of our legal system or the innate cocksureness of the people that live under it, so that even as Mr. Podsnap talked to the Frenchman as if he were a deaf child, we assume that our common-law notions are part of the legal order of nature and are unable to understand that any reasonable being can harbor legal conceptions that run counter to them.
ROSCOE POUND, THE SPIRIT OF THE COMMON LAW 2 (1921), quoted in *Thompson v. United States,* 546 A.2d 414, 428–29 n. 29 (D.C.1988).

the decisions which are made from this point forward.

The right to seek redress in the courts is a fundamental one. Yet that right can be impaired or even extinguished as readily and as surely by litigation which never seems to end as by closing the courthouse door. How many plaintiffs have the resources to fight this kind of case for thirteen years or more? Assuming that Ms. Oxendine's attorneys have been retained on a contingency basis, how many lawyers could afford to litigate for such a period without, as yet, receiving any fee? Many if not most similarly injured parties would have been compelled long ago to abandon the effort entirely, or to settle for a recovery far beneath the reasonable value of the case. The delays to date, in other words, have *already* done intolerable damage, and it is now surely the obligation of this court and of the trial court to resolve the problem rather than compounding it. This case must therefore be brought to closure on an urgent basis, as soon as this can be fairly and equitably accomplished.

## II.

In light of the foregoing considerations, I am frankly troubled by the notion that Merrell Dow can be (and indeed has been) permitted to raise the "federal preemption" issue at so late a stage of the litigation. The trial judge having elected to address the merits, I suppose that we should do so too, and I am prepared to state, more bluntly than Judge Steadman has done, that Merrell Dow's contentions in this regard have no merit whatsoever.[3] Even if its preemption argument were more persuasive, Merrell Dow should not be heard to raise it for the first time now.

We have repeatedly stated that "litigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal." *Hunter v. United States*, 606 A.2d 139, 144

(D.C.), *cert. denied*, —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). Here, Merrell Dow kept the contention in its hip pocket for some ten years (and four appeals) after the jury trial which resulted in the judgment in favor of Ms. Oxendine. Assuming, solely for the sake of argument, that preemption is a valid defense, Merrell Dow should have pressed it from the outset. The complaint would then have been dismissed at the pleading stage. A trial and at least three of the four appeals could have been avoided.

Ms. Oxendine argues in her brief that "the obvious purpose of raising this matter now is to obtain further delay." I cannot read minds, and I would therefore substitute the word "effect" for the word "purpose." Either way, the contention comes far too late.

## III.

I am also troubled by Merrell Dow's apparent position that, because so much time has passed, it is now entitled to litigate all over again, in the light of developments since the trial, the very question which was decided by the jury almost a dozen years ago.[4] I agree with Judge Steadman's disposition of the issue of newly discovered evidence, but add a few thoughts of my own.

At least in a case in which the appellate process remains incomplete, there has to be some leeway for correcting an error where new scientific developments demonstrate that a manifest injustice has been done. To use an imperfect analogy, few would argue that a criminal defendant who has been convicted of rape or murder must go to the electric chair or stay in prison even if DNA evidence shows that he did not commit the crime. The stakes here are not quite as high, but fair-minded people would agree that Merrell Dow ought not to be compelled to pay Ms. Oxendine many hundreds of thousands of dollars in damages if it has become obvious that Bendectin was not the cause of her deformi-

---

3. Merrell Dow's assertion that it implicitly raised the issue in its answer, or at some other earlier stage of the litigation is, in my opinion, completely specious.

4. Merrell Dow earnestly argues that the jury was wrong and that no impartial trier of fact could

hold Bendectin responsible for Ms. Oxendine's injuries. I note that the experienced trial judge agreed with Merrell Dow. We simply cannot use *Oxendine IV*, however, as a vehicle for second-guessing *Oxendine I*.

ties. In my opinion, Judge Steadman has drawn just the right balance between the two competing considerations, namely, the need for closure on the one hand and the opportunity to correct an injustice with newly-discovered evidence on the other.

But in exercising its discretion on remand, the trial court may and should consider that this is not 1982 or 1984 or even 1990. Given where we are today, considerations of finality have become so compelling that in my view, nothing short of an extraordinarily persuasive proffer by Merrell Dow would warrant hearing new testimony, revisiting the jury's verdict, and further delaying Ms. Oxendine's recovery. If the trial judge declines to reopen the record on remand, I have seen nothing to suggest that this would be an abuse of discretion on his part.

This raises the question whether our remand in the case is a futile act—form over substance, prolonging the delay. The notion that we should affirm and get the case over with has some obvious appeal but, largely for the reasons stated by Judge Steadman, I do not think we can properly do so. The trial judge wrote, in pertinent part, that "the outcomes of both *Oxendine I* and *Oxendine II* were acknowledgments that the jury had correctly [5] determined the outcome of this litigation. It would now be inappropriate to contradict such mandates...." As the judge recognized, however, *Oxendine I* and *Oxendine II* could not and did not decide anything about Merrell Dow's claim of newly discovered evidence. They did not dispose of the issue now before us.

## IV.

Although we are remanding the case to the trial court, it is my understanding that our difference of opinion with the trial judge is comparatively slight, and that we have directed only a very limited inquiry on remand and have recognized the trial judge's broad discretion. *See* maj. op. at 832 n. 16. It is my view and, I think, the court's, that in

exercising his discretion, the judge may properly include in his calculus the past delays in this case and the consequences for Ms. Oxendine [6] if this protracted litigation does not finally come to an end.

---

5. "Permissibly" would be a more accurate term than "correctly."

6. And, potentially, for other similarly situated litigants.