Bobby MADISON, Appellant,

v.

SUPERIOR IRON WORKS and
Hyman/Clark Construction
Group, Inc., Appellees.

No. 98–CV–620.

District of Columbia Court of Appeals.

Submitted May 25, 1999.
Decided Feb. 24, 2000.

Altomease R. Kennedy, Washington, DC, was on the brief for appellant.

Sharon M. Chambers, Fairfax, VA, was on the brief for appellees.

Aurelius K. Wilson, Fairfax, VA, also entered an appearance for appellees.

Before TERRY, RUIZ, and REID, Associate Judges.

TERRY, Associate Judge:

Appellant, Bobby Madison, filed this personal injury action against appellees, Superior Iron Works and the Hyman/Clark Construction Group, Inc., seeking damages for an injury he suffered while working at the World Bank building in downtown Washington. After a five-day trial, the jury found that the defendants were negligent but that their negligence was not the proximate cause of Madison's injury. Because of its finding on proximate cause, the jury did not reach the question of damages. Madison filed a motion for new trial, arguing that the court erred in denying his pre-trial motions to add expert witnesses and for a continuance, and also asserting that he should have a new trial because of newly discovered evidence. The trial court denied the motion, and Madison noted this appeal. We hold that Madison's newly discovered evidence warrants a new trial on the issue of proximate cause as well as damages. We therefore reverse the judgment and remand the case for a new trial.

## I

### A. Factual and Procedural Background

Bobby Madison was a supervisor for the Atlantic Plate Glass Company, working on a jobsite at the World Bank building. On June 23, 1993, Madison tripped over a loosely stretched welding lead on the bottom step of a staircase at the job site and fell on his back. The fall caused his hard hat to come off and his neck to "pop." The Hyman/Clark Construction Group was the general contractor of the project; Superior Iron Works was the subcontractor responsible for placing the welding lead.

Madison reported his fall to the shop steward and to the office of Atlantic Plate Glass in Harrisonburg, Virginia, but he did not immediately seek medical attention because he did not think he was seriously injured. Soon after the accident, however, Madison began to experience pain in his neck and right shoulder and occasional numbness in the fingers of his right hand. By August the pain had progressed to the point that he was having difficulty sleeping at night, so he finally decided to see a doctor.

On August 24, 1993, Madison began a course of treatment supervised by several doctors in the neurology department of the University of Virginia Hospital ("UVA") in Charlottesville, Virginia, under the direction of Dr. John Jane. Over the course of the next three years, Madison saw a number of doctors at UVA, but he was treated by Dr. Jane personally on only one occasion. Though his pain never subsided, Madison continued to work until June of 1996, when he stopped working on the

advice of Dr. Donald Manning, one of his treating physicians at UVA.

In May of 1997 Madison was referred to a pain specialist, Dr. Jimmy Adams. Initially, Dr. Adams diagnosed Madison with myofascial pain with paresthesia,[1] decreased grip strength, limited range of motion and numbness in his right hand, and limited range of motion, pain, and intense muscle spasms in his right shoulder and neck area. At a pre-trial conference on September 9, 1997, Madison requested permission to call Dr. Adams as his treating physician, even though the court's scheduling order provided that expert witnesses had to be named by October 1, 1996, and discovery was to close on February 1, 1997. The motions judge permitted the parties to depose Dr. Adams but reserved ruling on the admissibility of his testimony.

A report written by Dr. Adams on October 8, 1997, concluded that Madison was permanently disabled and would not be able to return to his prior employment. Madison's counsel told the court at a later hearing that this report, written almost a month after the pre-trial conference, was the first time that Dr. Adams, or any other doctor for that matter, had ever expressed the opinion that Madison was permanently disabled so that he could not return to his previous job as an iron worker. On the basis of Dr. Adams' report, Madison moved on November 19 for leave to present two additional expert witnesses at trial, a vocational rehabilitation specialist and an economist. The motions judge denied the motion but ruled that Dr. Adams could testify at trial as Madison's treating physician. On January 12, 1998, Madison moved for reconsideration of that ruling and also moved for a continuance so that "discovery could be completed concerning

the vocational rehabilitation expert and economist as well as the addition of Dr. Robert L. Muller," a clinical psychiatrist.[2] This motion was denied by the same motions judge on February 2. Madison renewed the motion a few weeks later, just before the trial began, but the trial judge also denied it.

## B. *The Trial*

Testifying at trial, Dr. Adams opined with a reasonable degree of medical certainty that Madison's symptoms were related to his fall at the jobsite on June 23, 1993. This conclusion was based on Madison's twenty-six visits to Dr. Adams, his description of the fall, and his representation that he had experienced no pain before he fell. Dr. Adams also stated that a magnetic resonance imaging (MRI) examination had revealed a herniated disc in Madison's back, but the judge instructed the jury to disregard this testimony because Dr. Adams had testified differently in his deposition, and Madison's counsel had failed to notify the defendants of the change.

Dr. John Jane, testifying by *de bene esse* deposition on behalf of the defendants, expressed the opinion that Madison did not have a significant injury. When asked whether the accident was the cause of Madison's current pain, Dr. Jane responded, "Well, since I don't think that he sustained an injury at that time, I therefore also don't think that that was related to the injury, to the supposed injury." Dr. Jane was unable, however, to explain why Madison continued to experience severe pain. He stated that despite his best efforts and those of his team of doctors, they could not come up with any medical reason for Madison's continued symptoms. Dr.

1. Dr. Adams explained that "myofascial pain with paresthesia" meant that Madison's hand was painful to the touch.

2. At Dr. Adams' request, Dr. Muller conducted a psychiatric evaluation of Madison. In a letter to Dr. Adams, Dr. Muller concluded, "[I]t is quite clear ... that there is no evi-

dence of any psychological factors as the etiology of his pain, nor does it appear that he is feigning such pain for other gains. This man is truly in chronic, excruciating physical pain, with strong emotional consequences to his pain."

Jane did say, however, that Madison had a "small disc herniation at C6–C7 on the right," but he did not believe that this herniation was impinging on Madison's nerve root in any significant way.

Dr. Robert Gordon also testified for the defendants. From his own examination of Madison and his review of Madison's medical records as of October 1996, Dr. Gordon concluded that there was no physical basis for Madison's reported symptoms of pain. Additionally, Dr. Gordon stated that "myofascial pain syndrome" is a diagnosis given to patients who complain of pain which has no physical basis.

The jury returned a verdict in favor of the defendants, finding that although they were negligent, their negligence did not proximately cause any injury to Mr. Madison.

### C. *Newly Discovered Evidence*

In January 1998, one month before the trial began, Dr. Adams referred Mr. Madison to Dr. Bart Balint, an anesthesiologist specializing in pain management. On February 10 Dr. Balint performed cervical facet nerve blocks[3] at the cervical segment of C6–C7. He reported that "a 40% reduction in pain was documented for approximately eight hours following the block, consistent with the diagnosis of cervical facet arthralgia."

On March 4, five days after the jury returned its verdict, Dr. Balint performed a cervical discography on discs C4–C5, C5–C6, and C6–C7. After completing this procedure, Dr. Balint made an "objective finding" of both pain reproduction and an annular tear with discal herniation at disc C6–C7.[4] Dr. Balint also stated that his review of Mr. Madison's medical records from UVA—in particular, a cervical MRI done in October of 1993 and cervical mye-

lograms in March 1996 and May 1997—"shows the same 'objective finding' of annular tear with discal herniation at C6–C7." On the basis of his own physical examination as well as his review of previous medical data and the cervical discography performed on March 4, Dr. Balint stated in a letter to Mr. Madison's attorney dated March 10, 1998:

> [I]t is my opinion that the annular tear and discal herniation at C6–C7 is the primary cause of Mr. Madison's chronic cervical pain. It is also my opinion [that] *the C6–C7 herniation was "proximately caused" by Mr. Madison's on-the-job injury of June 23, 1993.* It is also my opinion that the C4–C5 medial branch nerve blocks performed on Mr. Madison at the UVA Pain Clinic were an attempt to identify pain from the C4–C5 facet joint and could not in any way be diagnostic for any pain emanating from the C6–C7 facet joint or the C6–C7 disc. Furthermore, it is my opinion that until February 10, 1998, when C6–C7 facet nerve blocks were completed, no specific testing had been completed nor ordered by Dr. John Jane or the UVA Pain Clinic to help determine if either Mr. Madison's facet joint or disc at C6–C7 was the cause for Mr. Madison's ongoing pain. [Emphasis added.]

On March 13, 1998, Madison filed a "motion for a new trial on damages" based on the new evidence produced as a result of the March 4 procedure. The trial court denied the motion, ruling that Dr. Balint's findings were not likely to produce a different result at a new trial because they did not relate to the issue of proximate cause.

## II

"The nature of a motion is determined by the relief sought, not by its label

---

**3.** A facet is a bony articulation or joint in the back, identified as a right and left pair. A facet nerve block is a procedure in which an anesthetic is injected into an area that is suspected as a generator of pain.

**4.** Dr. Balint stated that "while no pain was elicited at either C4–C5 or C5–C6, an 'exact reproduction' of Mr. Madison's pain was recreated with injection at C6–C7 with subsequent fluoroscopy and CT pictures showing a posterior annular tear and discal herniation at that level."

or caption." *Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801, 804 (D.C.1984) (citations omitted). Thus it is of no moment that Madison's motion specifically requested only "a new trial limited to the issue of damages" or that it cited Rule 59 rather than Rule 60(b). *Id.* In *Wallace* the appellants filed a motion for reconsideration without citing the rule on which the motion was based. We first noted that when a moving party requests, for the first time, consideration of additional circumstances or newly discovered evidence, the motion should be considered under Rule 60(b), while motions seeking relief based on an asserted error of law properly fall under Rule 59(e). *Id.* at 804. In the instant case, Mr. Madison sought relief based both on errors of law (the denial of his motions to add expert witnesses and for a continuance) and on a proffer of newly discovered evidence; thus his motion came partially under Rule 59(e) and partially under Rule 60(b). As we said in *Vincent v. Anderson*, 621 A.2d 367 (D.C.1993):

> A motion which requests consideration for the first time of additional circumstances is one which may be designated more properly as filed under Rule 60(b).... However, *where it is not clear whether a particular motion should be considered appropriately under Rule 59(e) or 60(b), consistent with the liberal construction policies of these rules, the motion should generally be considered under Rule 59(e), if timely filed.*

*Id.* at 371 (emphasis added) (citing *Wallace*, 482 A.2d at 804, and *Forgotson v. Shea*, 491 A.2d 523, 528 (D.C.1985)).[5] *See also Merrell Dow Pharmaceuticals, Inc. v. Oxendine*, 649 A.2d 825, 831–832 (D.C. 1994) (citing *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir.1990)); *Forgotson*, 491 A.2d at 528 n. 9 (motion for reconsideration same as motion for new trial); *Graves v. Nationwide Mutual Insurance Co.*, 151 A.2d 258, 260 (D.C.1959) (nature of motion determined by relief it seeks); *Philip v. Mayer Rothkopf Industries, Inc.*, 635 F.2d 1056, 1063 (2d Cir. 1980).

■ Although Madison captioned his motion as one seeking a new trial solely on the issue of damages, in his memorandum in support of the motion he argued:

> If the jury had had the benefit of Dr. Balint's testimony showing an objective finding of a C6–C7 herniation, dating back to October 1993 and continuing to date, combined with the objective evidence produced by the cervical discography which was only done five (5) days *after* the completion of the trial, and Mr. Madison's decrease in pain from a nerve block at the "correct" cervical level, the jury's verdict would have been different on the issue of proximate cause and damages. [Emphasis in original.]

Moreover, it is apparent from the trial court's order that the court gave due consideration to Madison's argument as it related to proximate cause. Therefore, we conclude that Madison has adequately preserved the issue of whether he is entitled to a new trial on the issue of proximate cause as well as damages.

■ When a losing party seeks a new trial based on a claim of newly discovered evidence,

> the evidence must be in fact newly discovered, that is, discovered since the trial; it must be shown that it was not due to want of diligence that the movant did not discover the evidence sooner; the evidence relied on must not be merely cumulative or impeaching; and it must be such as would probably produce a different verdict if a new trial were granted.

---

5. To the extent that the motion fell within Rule 59(e), its timeliness is not an issue here. The jury returned its verdict on Friday, February 27, 1998, and the judgment was entered on the same day. Excluding Saturdays and Sundays from the calculation as required by Super. Ct. Civ. R. 6(a), the tenth day after entry of the judgment was Friday, March 13. Since Madison's motion was filed on March 13, it was timely under Rule 59(e).

*Imhoff v. Walker*, 51 A.2d 309, 312 (D.C. 1947); *accord, e.g., Mahallati v. Williams*, 479 A.2d 300, 305 (D.C.1984); *Frost v. Hays*, 146 A.2d 907, 908–909 (D.C.1958); *Potts v. Catterton*, 82 A.2d 133, 134 (D.C. 1951). "The granting or denying of a motion for new trial is within the discretion of the trial court and will not be disturbed on appeal unless an abuse of that discretion appears." *Bradley v. Prince*, 105 A.2d 253, 254 (D.C.1954); *accord, e.g., Wallace*, 482 A.2d at 810 (citing cases).

The trial court justified its denial of Madison's motion for a new trial by construing the motion as an attempt to prove proximate cause by first establishing the existence of damages. In its order denying the motion, the court stated:

> Plaintiff is trying to suggest that if the jury were allowed to consider an objective instead of a subjective basis for the pain and suffering that the plaintiff has experienced, they would reverse the jury's finding on proximate cause. The result being, that instead of damages being determined based on proximate cause, proximate cause would be determined based on the evidence concerning damages. A jury ... cannot determine damages until proximate cause is established. Once there is no proximate cause, evidence of damage suffered becomes irrelevant.

The trial court's interpretation of Dr. Balint's findings is not supported by the doctor's letter and medical report, which were attached to Madison's motion. Dr. Balint's letter clearly states two separate conclusions, one of which relates to the question of damages and the other to proximate cause. First, Dr. Balint declares that Mr. Madison has an objective physical basis for his pain and that he is permanently disabled from working. Second, Dr. Balint states his opinion that Madison's injury was proximately caused by the accident in June 1993. To the extent that Dr. Balint's opinion as to proximate cause may be based upon his finding of objective physical evidence of an injury, that surely

does not make his opinion as to causation any less persuasive or reliable than that of Dr. Jane, which was based solely on the *absence* of such physical evidence.

■ Applying the standard set forth in the cases we have cited, we hold that Dr. Balint's findings constituted newly discovered evidence which warranted a new trial on the issues of both proximate cause and damages. First, the evidence was manifestly "new": it did not exist until after the trial, and the delay in producing it cannot fairly be ascribed to any lack of diligence on the part of Madison or his attorney. Rather, the reason why this evidence was previously unavailable appears to be that the doctors who treated Madison at UVA were unable to diagnose and hence unable to treat his injury. This is not a case of "opinion shopping," where the would-be plaintiff switches doctors in an attempt to find one who will provide a favorable opinion for litigation purposes. On the contrary, Madison changed doctors only when it became apparent that his original treating physician, Dr. Jane, was unable to relieve his painful symptoms.

We also hold that Dr. Balint's post-trial finding of causation satisfies the remainder of the test for granting a new trial; that is, it is not merely cumulative or impeaching, and it would likely produce a different verdict in a new trial. Dr. Balint would not be simply stating a different opinion based on the same facts that were available to the doctors who testified. Instead, he would be providing new objective evidence of a physical basis for Mr. Madison's symptoms. The lack of any such evidence was the basis for the opinions expressed by appellees' experts that the accident was not the cause of Madison's symptomatology. Dr. Balint can now offer evidence that directly refutes their opinions by establishing that an anatomical basis for Madison's pain does in fact exist. Unlike our *Mahallati* case, in which the newly discovered evidence related only to "collateral matters," the evidence here "relate[s] directly to the central issue in the case—whether

the injuries for which plaintiff was then seeking recovery were caused by the accident...." 479 A.2d at 305–06.

In assessing the weight that a jury would be likely to give Dr. Balint's testimony in a new trial, we deem it highly significant that Dr. Balint is the only doctor who has had any success at all in alleviating Mr. Madison's pain. A jury in a new trial would thus be called upon to compare the opinions of Mr. Madison's doctors at UVA, who were unable to provide any relief from his symptoms over the course of three years, with the opinion of Dr. Balint, who was able to obtain positive results in a matter of months. The jury would also have the benefit of Dr. Balint's conclusion that objective evidence of Madison's injury was available to his doctors at UVA but that they failed to analyze it properly and therefore did not reach a correct diagnosis. This testimony would substantially undermine the credibility of appellees' experts. For all of these reasons, we are persuaded that a jury given the opportunity to consider appellant's newly discovered evidence would, in all likelihood, reach a different conclusion on the dispositive issue of proximate cause.

### III

We hold that the newly discovered evidence proffered by Mr. Madison is neither cumulative nor collateral, that it could not have been discovered earlier through the exercise of due diligence, and that it is likely to result in a different verdict after a new trial. We therefore reverse the order denying Madison's motion for new trial and remand this case with instructions to

grant a new trial on both proximate cause and damages.[6]

*Reversed and remanded.*

---

**6.** Madison also argues that the trial court erred in denying his pre-trial motions to add expert witnesses and for a continuance. He claims that the court's rulings prevented him from demonstrating his need for continuing treatment and establishing his future lost wages. At this stage of the case, the request for a continuance is moot, but because we are ordering a new trial, the testimony of the additional witnesses may be quite relevant.

Assuming that Madison complies with all applicable time requirements, it is difficult to foresee any reason why these witnesses should not be permitted to testify on his behalf at a retrial. To avoid any uncertainty about the scope of our reversal, therefore, we direct the trial court on remand to take a fresh look at the motion to add expert witnesses and to rule on it *de novo* in light of what we have said in this opinion.